[L. A. No. 29411.    In Bank.    Apr. 19, 1968.]

GEORGE B. CORN, Petitioner, v. THE STATE BAR
OF CALIFORNIA, Respondent.

George B. Corn, in pro. per., Robert C. Baxley and Condra, Baxley & Crouch for Petitioner.

F. LaMar Forshee and Herbert M. Rosenthal for Respondent.

THE COURT.—This is a proceeding to review a recommendation of Disciplinary Board II of the State Bar of California that petitioner be suspended from the practice of law for a period of three years.

*Questions:* First. *Does the evidence sustain the finding of culpability on the part of petitioner?*

*Yes.* ▮ The burden is upon one seeking a review of a recommendation of a disciplinary board to show that its findings are not supported by the evidence or that its recommendation is erroneous or unlawful. (*McKinney* v. *State Bar,* 62 Cal.2d 194, 195 [2] [41 Cal.Rptr. 665, 397 P.2d 425].) ▮ In the present case, the record discloses that petitioner has not sustained this burden.

The record shows that in December 1964 petitioner was employed to represent Mr. Lawrence Symonds in a bankruptcy proceeding. The agreed fee was $200, plus $2 for forms and $50 for court costs. An additional $50 fee was later

agreed upon as a result of a necessary amendment to the petition for bankruptcy, making a total due by Mr. Symonds of $302. At the time petitioner was employed, he was paid $50, which Mr. Symonds had obtained as an advance from his employer.

Mr. Symonds' wife had formerly been married to a Mr. Siemons. At the time petitioner was employed to represent Mr. Symonds in the bankruptcy proceeding. Mrs. Symonds was receiving county warrants covering child support payments made by her ex-husband as a result of a reciprocal support action. The warrants were payable to her under the name of "L. L. Siemons," her former name.

According to Mrs. Symonds' testimony, she agreed to turn over to petitioner, to apply on the amount due him in the bankruptcy matter until he had been paid in full, half the child support payments received by her. To this end, she suggested that the county be requested to mail the warrants to her in care of petitioner at the latter's office.

Accordingly, by letter dated December 29, 1964, petitioner wrote the county clerk, as follows: "My client and I have signed a retainer contract under which a *percentage* of the support collected in the above case will be used to pay my attorney's fees. Therefore we request that you *make all checks payable to my client,* and mail them in care of me to the above letterhead address. When my fees are paid in full, I will notify you by mailing to you a copy of this letter with the bottom portion [an acknowledgment that the fees had been paid] signed." (Italics added.) The letter bears a notation, "I approve," signed "Mrs. L. Siemons."

A warrant dated January 27, 1965, in the amount of $50, was received at petitioner's office and was mailed by petitioner's secretary to Mrs. Symonds on January 28, 1965, with the request that she sign the same and return it to petitioner's office. The warrant bears endorsements by both "L. L. Siemons" and petitioner. Petitioner's secretary on February 1, 1965, issued a receipt in the amount of $50, and this amount was credited to the account of Mr. Symonds.[1]

---

[1] A ledger card showing the status of Mr. Symonds' account with petitioner shows, in addition to $50 credits on December 8, 1964, and February 1, 1965, an additional $50 credit on February 4, 1965; but apparently this credit represented a payment by Mr. Symonds, petitioner having testified, as follows: "Q. Well, now your ledger card would indicate that the original $50 was paid on account on the 8th day of December and that you received $50 again on February 1st and on February the 4th? A. That is correct. Q. Were those as a result of receiv-

A warrant dated January 29, 1965, in the amount of $50, was also sent to petitioner's office. The record does not reveal how the warrant was transmitted to Mrs. Symonds, but the warrant bears her proper endorsement and a further endorsement, "For deposit only, Pay to the order of Security First National Bank, John N. Radovich, Bldg. Account."

A number of the bills relative to which Mr. and Mrs. Symonds were being harassed by creditors were actually indebtednesses incurred by Mrs. Symonds before she married Mr. Symonds. According to her testimony, she thought that she was to be included in the bankruptcy proceeding, so that there would be a discharge of those indebtednesses, as well as the indebtednesses of Mr. Symonds. When she learned that she was not included,[2] she became very angry with petitioner and indicated she would pay nothing further on the fee. She was also displeased because certain items were not set aside by the trustee as exempt.

Thereafter, a warrant dated March 1, 1965, in the amount of $100, was received by petitioner. He claims that he tried several times to contact Mrs. Symonds by telephone but was unable to reach her and that he then went ahead and endorsed the warrant in her name ("L. L. Siemons") at his office, took it to the bank, endorsed his name on it with a different pen, and deposited it in his personal savings account.

Upon petitioner's return to the office, he wrote out a receipt showing that $100 had been credited to Mr. Symonds' account. A few days later, he sent Mr. Symonds a statement showing that the $100 had been credited to the account. Shortly after the statement was received, Mrs. Symonds telephoned petitioner and complained bitterly of his action, saying he had no authority to endorse her name.

Mrs. Symonds reported the matter to the county authorities and signed an affidavit of forged endorsement. She then endorsed the warrant and was paid $100 by the county. The county notified the bank of the forgery, and the bank reimbursed the county, charging petitioner's account.

Although petitioner did not endorse in Mrs. Symonds'

ing two warrants prior to this one? A. The one on February the 1st was a warrant, but the one on February the 4th, three days later, was not." Earlier, petitioner had stated, ". . . the primary agreement was that Mr. Symonds was to pay the fee from his commissions, from his earnings."

[2]Petitioner testified that she was not included because another $100 fee would have been required; that this was explained to Mr. and Mrs. Symonds; and that it was agreed the proceeding would be in Mr. Symonds' name alone.

behalf either of the two $50 warrants, he claims that under his original agreement with the Symonds he was authorized to endorse any of the warrants in her behalf, cash them, and apply the entire proceeds to Mr. Symonds' indebtedness to him. Mr. Symonds' former employer testified, in petitioner's behalf, that both Mr. and Mrs. Symonds had, in his presence, acknowledged in a conference telephone call, with petitioner at the other end of the line, that petitioner had such authority.

Mrs. Symonds unequivocally denied that she had authorized petitioner to endorse and cash the warrants and further testified that under their agreement petitioner was to receive only half the payments.

The foregoing evidence amply supports the finding of culpability on the part of petitioner.

Second. *Was it proper to admit testimony by two handwriting experts that in endorsing the name "L. L. Siemons" on the back of the warrant, petitioner had made an effort to disguise his handwriting?*

*Yes.* Expert opinion evidence as to handwriting is basically a process of comparison of writings. (See McBaine, Cal. Evidence Manual (2d ed. 1960) Expert Opinion, §§ 522-523, p. 173.) In the present case, the testimony of the handwriting experts was based upon a comparison of writings and was properly received.

Petitioner admitted that he had signed both his own name and the name "L. L. Siemons" on the back of the warrant, and no contention was made that he had attempted to make it appear that Mrs. Symonds had signed the name "L. L. Siemons." However, at petitioner's hearing the members of the State Bar local committee indicated they felt it important to know whether petitioner had signed the name "L. L. Siemons" in such a way that it would appear that the two signatures had been written by different persons.

The handwriting experts were asked, in answering this question, to compare the handwriting which petitioner had used in signing the name "L. L. Siemons" with the handwriting he had used in signing his own name and, in addition, with the handwriting used on a receipt petitioner admittedly had written acknowledging receipt from "Larry Symonds" of the proceeds of the $100 draft. Petitioner had testified that although his own signature was written in a different style from his usual handwriting, the signature "L. L. Siemons" was written in his normal style of writing.

In comparing the signatures on the back of the warrant, the handwriting experts pointed out that the name "L. L. Siemons" appeared to have been signed with a ballpoint instrument in blue ink, while petitioner's signature appeared to have been signed with a fountain pen having a wide tip and containing black ink; that two different methods of writing were used, petitioner's signature having been written in a free flowing hand and the other signature at a slower speed; and that there was a difference in the size and line quality of the writing. The conclusion of the experts was that the average lay person looking at the two signatures would think they had been written by two different persons.

In the comparison of the signature "L. L. Siemons" on the back of the warrant with petitioner's handwriting on the receipt, attention was called to the fact that in writing the name "L. L. Siemons" petitioner had formed the capital *L's* and the capital *S* as in printing, whereas in writing the receipt he had used regular script letters for both the capital *L* and the capital *S* appearing thereon. One of the experts said that the writing on the receipt appeared "somewhat different in the forming of the letters, the written letters, and the printing letters that show up on the check." The other expert stated: "If Exhibit 'Q' [the receipt] is an example of his natural writing then there is a difference. Exhibit 'Q' shows the skill or abilities and there is more skill shown there than there is on the questioned signature."

As pointed out by petitioner, the question asked called for an opinion of petitioner's state of mind, which was one of the ultimate issues in the case. However, in *People* v. *Polk*, 61 Cal.2d 217, 233 [8] [37 Cal.Rptr. 753, 390 P.2d 641], this court said: ". . . an expert opinion is not inadmissible merely because it coincides with an ultimate issue of fact." (See also Evid. Code, § 805.)

Third. *Was the degree of discipline appropriate under the circumstances?*

*Yes.* The record discloses that petitioner was publicly reproved in May 1966 (San Diego 266) and was thereafter suspended twice, for one year on probationary terms (Bar Misc. 3013) and for three months (Bar. Misc. 3050).

In view of the difficulty in passing upon the weight to be given the testimony of a witness when only the written record is before a reviewing body, it is proper to give great weight to the action of the local administrative committee which heard it, such body being in a better position than the

disciplinary board or this court to pass upon the truthfulness of the testimony. (*McKinney* v. *State Bar, supra,* 62 Cal.2d 194, 196 [5].)

It would appear from the evidence that petitioner over a period of time failed to meet the high standards required of members of the legal profession and that suspension for a period of three years, as recommended by Disciplinary Board II, is an appropriate penalty. (Cf. *McKinney* v. *State Bar, supra,* 62 Cal.2d 194, 196-197 [4b].)

It is ordered that petitioner be suspended from the practice of law for a period of three years, the order to become effective July 19, 1968.

Petitioner's application for a rehearing was denied May 29, 1968, and the judgment was modified to read as printed above.