[S. F. No. 22639. In Bank. Oct. 24, 1969.]

CONSTANTINE FITZGERALD ESCHWIG, Petitioner, v. THE STATE BAR OF CALIFORNIA, Respondent.

Counsel

George T. Davis and Lynn S. Carman for Petitioner.

F. LaMar Forshee and Herbert M. Rosenthal for Respondent.

---

**THE COURT.**—This is a proceeding to review a recommendation of the Disciplinary Board of the State Bar of California that petitioner be disbarred. Both the local administrative committee and the disciplinary board unanimously recommended disbarment.

The record shows that in November 1959 Mendola Mae Handel, whose husband, Fred G. Handel, was hospitalized with a terminal illness, was concerned about her ability to manage her affairs after the expected death of her husband. Mrs. Handel, about 80 years of age, consulted petitioner, making it clear to him that she lacked business experience and had no friends or relatives on whom she could rely. Petitioner prepared a will for Mr. Handel, designating Mrs. Handel as executrix and naming her the sole beneficiary. At the same time, petitioner prepared a power of attorney for Mrs. Handel to execute, naming himself as her attorney in fact.

On December 7, 1959, less than a month after the will and the power of attorney were executed, Mr. Handel died, and his wife thereafter became the executrix of his will in probate proceedings, with petitioner serving as her attorney. An inventory and appraisal of the decedent's assets, filed in February 1960, showed that the principal asset of the estate was a small residence on an acre of land located on a Mill Valley hilltop in Marin County. The property was appraised at $9,000.[1]

On May 7, 1960, during pendency of the probate, Mrs. Handel and petitioner and his wife entered into a three-page agreement, prepared by petitioner, by the terms of which Mrs. Handel agreed to sell the above mentioned real property to petitioner and his wife. From petitioner's own testimony, it is clear that at that time Mrs. Handel placed complete trust in him and relied upon him with respect to her financial affairs.

Under the agreement, no money was paid by petitioner or his wife at the time the agreement was executed, but as "purchasers" they obligated themselves, among other things, to provide for Mrs. Handel for the balance of her life and to pay the costs of attorney's fees and other charges in the proceedings for the probate of Mr. Handel's will, as well as claims for the expenses of Mr. Handel's last illness and burial.[2]

---

[1] Approximately three years later, the property was sold for $18,500.
[2] Under the agreement, petitioner and his wife agreed, as follows:
"(a) To accept a Warranty Deed in and to said described premises containing the

Virtually none of the requirements of sections 16300 et seq. (formerly and in 1960 §§ 2300 et seq.) of the Welfare and Institutions Code, governing life-care contracts in this state, were met by the agreement of May 7, 1960. Petitioner testified that at the time he drafted the agreement he used a form book without researching any of the applicable law and that at that time he was unaware of the statutory requirements of life-care contracts.

On the day the agreement was signed, Mrs. Handel executed a grant deed, prepared by petitioner, conveying the property to petitioner's wife, Deon D. Eschwig. Petitioner, however, did not disclose to the probate court Mrs. Handel's sale of the property on May 7, 1960, or seek court confirmation of the sale, as required by section 755 of the Probate Code.[3]

On May 25, 1960, the probate court signed an order, prepared by petitioner, granting a petition by the executrix to set apart a homestead on the real property to her, as the surviving widow.

On August 31, 1960, petitioner filed a "First and Final Account" and a "Report Accompanying First and Final Account, and Petition for Distribution." Petitioner had prepared the documents on Mrs. Handel's behalf and had her execute them under penalty of perjury.

The final account showed the real property as part of the decedent's estate at a value of $9,000. The "report" accompanying the final account showed alleged expenditures by the executrix for funeral expenses, hospital

---

usual 'Covenants and Warranties, which Deed shall be duly executed and acknowledged by the Seller at Seller's expense, so as to convey to the purchaser the fee simple to said described premises, including all household furniture furnishings, and appliances.

"(b) To pay all taxes upon the premises herein described.

"(c) To keep the building and improvements thereon in good repair and condition during the lifetime of the Seller.

"(d) To clothe the Seller during her lifetime in accordance to the station of life of the Seller and her accustomed habits of living.

"(e) To pay all necessary expenses that may result from any illness of the Seller.

"(f) To pay all funeral expenses that may be incurred at the death of the Seller.

"(g) To contribute sufficient monies during the lifetime of the Seller necessary for her board and lodging upon the said premises, or elsewhere, if in the opinion of the purchaser it should be necessary for the welfare of said Seller. Any contribution so made shall be in excess of the social security payments and old age pensions now or hereafter being paid to the Seller.

"(h) To pay the costs of attorney fees and other charges in connection with the administration of the Estate of Fred Handel, also Known as Fred G. Handel, also known as Fred George Handel, numbered 13355, and to pay claims of said estate for the last illness and burial expenses of said Fred Handel, deceased."

[3]Section 755 of the Probate Code provides (with certain exceptions inapplicable here): ". . . all sales of property must be reported to the court and confirmed by the court before title to the property passes. The report must be verified. Such report and a petition for confirmation of the sale must be made within thirty days after each sale. The clerk shall set the petition for hearing by the court and give notice thereof. . . ."

bills, and doctors' bills, totaling $1,584.94[4] and alleged expenditures of $1,013.84 by petitioner on behalf of the estate and the executrix.[5] It was requested that the court distribute the real property to Mrs. Handel under the will, but subject to a lien in petitioner's favor for his fee for alleged services and for his expenditures on behalf of Mrs. Handel, as executrix.

In the first and final account, it was stated, in part: "That there are no funds in said estate with which to pay the expenses of administration, or the attorney fees, and in addition thereto, your petitioner has by reason of the rundown condition of the house and real property requested that her attorney arrange for the renovation and cleaning up of said property so as to make the same habitable and comfortable for your petitioner, and that said expenses are chargeable to said estate, are due and payable, but unpaid, all of which expenses have been authorized by your petitioner, and requests that a lien be imposed on the real property herein described for such expenses of administration as well as attorney fees, and for cash laid out on behalf of said petitioner." The items covered were required by the terms of the May 7, 1960, agreement to be paid by petitioner as part of the consideration for the transfer of the real property.

On September 12, 1960, the probate court signed an order, prepared by petitioner, approving the final account, awarding petitioner attorney's fees and reimbursement for expenses, totaling $1,463.55, and giving him a lien in this amount against the real property, which was distributed to Mrs. Handel by the order.

On November 6, 1960, after the close of probate, petitioner recorded the grant deed by which Mrs. Handel had transferred to petitioner's wife title to the property.

Some time in 1961, petitioner, because of his wife's illness, moved to Placerville. Mrs. Handel remained in Mill Valley alone. According to petitioner, he drove to Marin County on numerous occasions, usually on weekends, for the specific purpose of seeing how Mrs. Handel was getting along and having someone clean the house. Finally, it became apparent that she could not continue to live alone in a remote house on a steep hillside; and after she was injured in a fall and hospitalized, petitioner, at the insistence of Dr. Wagner of Marin General Hospital, took her to the Placerville area in May 1962.

---

[4]The doctors' bills allegedly paid by the executrix were one for $275 to "Dr. Raney & Dr. Moore" and one for $100 to "Drs. Bernhart, Thornton & Raney." The record shows, however, that the claim of Drs. Raney and Moore was for only $126, of which $100 had been paid by petitioner and the balance had not been paid, and that Dr. Bernhart had not been paid anything. The record further shows that the unpaid bills were brought to petitioner's attention but that he failed to pay them.

[5]Included in the amounts allegedly spent by petitioner were $15 for the cost of publishing notice of probate and $15 for the cost of publishing notice to creditors. Neither of these items had been paid, however.

Petitioner placed Mrs. Handel in a series of private homes, but changed her residence almost monthly. He testified that the changes were required, because she was rejected after the people agreeing to care for her became aware that she was suffering from an incontinency problem. There was evidence, however, that at least one operator of a licensed rest home, where petitioner had placed her, would have kept and cared for her at an additional charge of $50 per month, which petitioner was unwilling to pay. He said he paid $150 per month.

The last home in which petitioner placed Mrs. Handel in the Placerville area was the home of a woman who was on welfare and for whom he was handling a divorce matter. On the day Mrs. Handel was removed from the home, the weather was quite cold, and she was found fully clothed in bed under blankets, there being no heat in the house.

Mrs. Handel received social security payments of around $55 per month. During the time she resided in Marin County she received county aid, in addition; but the aid payments were discontinued when she moved to Placerville. Petitioner endorsed a few of the social security checks under the power of attorney executed by Mrs. Handel, but he testified that in each instance he gave the proceeds of the checks to Mrs. Handel.

Shortly after Mrs. Handel came to the Placerville area, petitioner learned from her that a Reverend Gerrard had filed a petition in Marin County to be appointed her conservator and had been appointed her temporary conservator. Petitioner resisted the Gerrard conservatorship and asked the court to appoint his (petitioner's) wife as conservatrix for Mrs. Handel. On January 18, 1963, however, the court appointed the public guardian to act as conservator for Mrs. Handel. Both petitioner's wife and Reverend Gerrard were rejected, the court finding that the appointment of either would not be in Mrs. Handel's best interests.

Subsequently, the public guardian had Mrs. Handel returned to Marin County, and in December 1963 he filed suit in the superior court to have the agreement of May 7, 1960, rescinded and the real property transferred back to Mrs. Handel. After a trial in April 1966, the superior court found that petitioner had violated his fiduciary relationship with Mrs. Handel, procured the agreement through undue influence, and breached the agreement. Judgment was entered rescinding the agreement and voiding the grant deed to petitioner's wife. This proceeding was instituted following the revelation in the rescission action of petitioner's misconduct.[6]

---

[6]Petitioner contends that the State Bar unreasonably and arbitrarily delayed instituting disciplinary proceedings against him. The record, however, does not support his claim. The civil rescission action was not tried until April 1966, and petitioner was served with a copy of the notice to show cause in October 1967.

Even if, as stated by petitioner, an official of a local voluntary bar association knew

■ *Questions:* First. *Does the evidence sustain the finding of culpability on the part of petitioner?*

*Yes.* ■ The burden is upon one seeking a review of a recommendation of the disciplinary board to show that its findings are not supported by the evidence or that its recommendation is erroneous or unlawful. (*Corn* v. *State Bar,* 68 Cal.2d 461, 462 [1] [67 Cal.Rptr. 401, 439 P.2d 313].) ■ In the present case, the record discloses that petitioner has not sustained this burden.

Petitioner's purchase of the principal asset of an estate while he was representing the executrix in the probate proceeding violated rule 8 of the Rules of Professional Conduct, and his failure to disclose the sale to the probate court constituted a violation of his oath and duties as an attorney and an act involving moral turpitude.

Rule 8 of the Rules of Professional Conduct provides: "A member of the State Bar shall not directly or indirectly purchase property at a probate, foreclosure or judicial sale in an action or proceeding in which such member appears as attorney for a party." ■ Petitioner's undisclosed purchase of the real property held as an asset of Mr. Handel's estate, although accomplished by him outside the usual probate procedures, was a "probate sale" and is the type of transaction proscribed by this rule.

■ An attorney representing the representative of an estate is under an obligation to seek the highest possible price on the sale of an estate asset. As a purchaser, however, he would be inclined to seek the lowest possible price. The resulting conflict of interest where the attorney becomes the purchaser is apparent. Because of the conflict of interest inherent in the situation, rule 8 is applicable even where an attorney is acting in good faith and even where there is competitive bidding. A conflict of interest exists, and is inherently more dangerous, in a sale during probate such as occurred here, because it was not public, was unknown to the court, did not involve competitive bidding, and allowed petitioner to overreach or exercise undue influence upon his client.

From the manner in which petitioner purchased the property and concealed the sale from the probate court, it is clear that he was seeking to avoid disclosing his violation of rule 8, with the probable adverse effect it would have had on the sale. Furthermore, the circumstances under which he bought the property and concealed the sale support an inference that he

---

of petitioner's conduct as long ago as 1961, such knowledge cannot be imputed to the State Bar.

Furthermore, petitioner's claim is being made for the first time in this court. He at no time raised the objection before the trial committee, and his counsel expressly waived objections to the procedures leading to the trial hearing, saying that petitioner was "ready to go today." Accordingly, even if there would have been a basis for petitioner's objecting, he has clearly waived it. (See *People* v. *O'Leary,* 130 Cal.App.2d 430, 436-437 [278 P.2d 933].)

exercised undue influence in acquiring the property from his client and attempted to keep this fact from the court.

██ In *Magee* v. *State Bar,* 58 Cal.2d 423, 429 [3], 431 [8a, 9] [24 Cal.Rptr. 839, 374 P.2d 807], this court said: "The highest good faith an attorney owes his client requires the attorney to rebut the inference of undue influence that arises when he receives a gift from the client under circumstances that reasonably suggest such influence. . . .

. . . . . . . . . . . . . .

"For the very reason that the boundary between ethical and unethical behavior in such cases is not clearly defined, attorneys should avoid drawing wills containing gifts to themselves under circumstances in which there is a reasonable basis for suspicion that the client was over-reached or that the gift would prevent the attorney from acting in the client's best interests. Such a practice would remove any temptation to deal unfairly and would protect the reputation of the profession. When an attorney does draw a will under circumstances that suggest that he took advantage of a client's weakness or that he benefited unduly he must justify his action as he must when an inference of undue influence arises."

██ It was also said in *Magee,* at pages 430-431 [6, 7]: "An attorney's duty of fidelity to his client involves far more than refraining from exercising undue influence. His fiduciary duty is 'of the very highest character.' [Citation.] For this reason all business dealings between attorney and client whereby the attorney benefits are closely scrutinized for any unfairness on the attorney's part. [Citations.] ██ In civil cases, 'there are no transactions respecting which courts . . . are more jealous and particular, than dealings between attorneys and their clients, especially where there is great intellectual inequality, and comparative inexperience on the part of the latter.' [Citation.]" Although the present case involved a sale, while *Magee* involved a gift, the policy considerations set forth there are equally applicable here.

In his brief, petitioner implies that he may have intended to sell the property and use the proceeds to care for Mrs. Handel, but that when the property was tied up in the conservatorship proceedings, this possibility was no longer available to him.[7] Thus, petitioner inferentially says either that it was not his intention to use his own funds or that his own funds became insufficient for Mrs. Handel's support. The provisions of the Welfare and Institutions Code hereinabove mentioned, which petitioner ignored in preparing the agreement, appear to be directed to preventing this type of support problem.

---

[7]In petitioner's brief, it is stated: "It should be noted that the conservatorship proceedings commenced prior to Mrs. HANDEL leaving the Mill Valley house to go to El Dorado County; and that because of the conservatorship proceedings, the asset upon which [petitioner] relied to enable him to support her was frozen from then on."

From the evidence it is clear that petitioner breached the terms of his agreement with Mrs. Handel in a manner designed to minimize his costs and maximize his profit, with no regard for her welfare, and has shown that he lacked good faith in entering into the agreement. In explaining why he obtained a lien for his attorney's fee and his alleged costs in connection with the administration of the estate, petitioner testified: "Q. Isn't it a fair statement that part of the consideration which passed to Mrs. Handel under this agreement of May 7, 1960, was that you were to pay every penny of costs and waive attorney's fees in the probate of her husband's estate? A. No, I did not. *I am not running a charitable institution.* I expected to be repaid in some manner." (Italics added.)

Although initially, when Mrs. Handel was relatively able to care for herself physically, petitioner showed some solicitude for her, his care of her as her physical condition deteriorated became seriously deficient. As hereinabove indicated, there is evidence that commencing in 1962 Mrs. Handel required nursing care, but that petitioner was unwilling to spend sufficient funds to provide adequate and appropriate care for her.

In his dealings with Mrs. Handel, petitioner placed himself in a position where his self-interest in the transaction prevented his giving disinterested advice to her. He nevertheless at no time suggested to her that before entering into the agreement she consult independent counsel. Petitioner then not only failed to disclose the transaction to the probate court, but filed documents leading the court to believe that the property remained as an asset of the probate estate. Under the circumstances, he clearly misled a judge in violation of section 6068, subdivision (d), of the Business and Professions Code.[8] Misleading a judge constitutes an act involving moral turpitude. (*Grove* v. *State Bar,* 63 Cal.2d 312, 315 [3] [46 Cal.Rptr. 513, 405 P.2d 553].)

In addition, petitioner failed to produce adequate records to show his handling of cash belonging to Mr. Handel's estate, payments allegedly made to creditors of the estate, and funds allegedly spent by him for Mrs. Handel under the agreement of May 7, 1960. This, in itself, is a suspicious circumstance. (See *Clark* v. *State Bar,* 39 Cal.2d 161, 174 [246 P.2d 1].)

Significantly, petitioner failed to convince either the local administrative committee or the court in the civil rescission action that he acted in good faith and without undue influence over his client. Petitioner's credibility as a witness being at issue, this court must give great weight to

---

[8]Section 6068 of the Business and Professions Code provides: "It is the duty of an attorney:

". . . . . . . . . . . . . . . . .

"(d) To employ, for the purpose of maintaining the causes confided to him such means only as are consistent with truth, and never to seek to mislead the judge or any judicial officer by an artifice or false statement of fact or law."

the findings of the local administrative committee. (*Corn* v. *State Bar, supra,* 68 Cal.2d 461, 466-467 [5].)

 Second. *Was the transcript of the testimony in the civil rescission action properly admitted in evidence against petitioner in this proceeding?*

*Yes.* Petitioner was a party to the civil action, the issues were essentially the same as those in the disciplinary proceeding, and petitioner was present at the trial and represented by counsel. Accordingly, the transcript was admissible under section 6049.2 of the Business and Professional Code.[9]

Petitioner did not object to the introduction of the transcript before the local administrative committee, but he now argues that under recent United States and California Supreme Court decisions such evidence is inadmissible in this proceeding. However, the cases which petitioner cites are criminal cases where there had been a lack of opportunity to cross-examine when the statements were made. Petitioner, on the other hand, had an opportunity to cross-examine in the civil rescission action and exercised such right. It should be noted, also, that the present proceeding is not a criminal action. (See *Best* v. *State Bar,* 57 Cal.2d 633, 637 [5] [21 Cal.Rptr. 589, 371 P.2d 325].)

 Third. *Is the degree of discipline appropriate under the circumstances?*

*Yes.* Petitioner used undue influence to acquire a valuable asset from an aged and ultimately helpless client, who relied on him, and he misled the probate court to prevent its scrutiny of the transaction. He then wilfully, by maintaining his client in inadequate surroundings and failing to provide her the care she needed, breached the agreement he had made to induce her to transfer the real property. From the evidence, it can be inferred that petitioner never intended to carry out all of his promises to her. Petitioner's misconduct involved moral turpitude, and under the circumstances disbarment is warranted even without consideration of his prior record. (See Bus. & Prof. Code, § 6106.)

Petitioner's prior record, however, may properly be considered in determining the appropriate discipline. (See *Pearlin* v. *State Bar,* 59

---

[9]Section 6049.2 of the Business and Professions Code reads: "In all disciplinary proceedings pursuant to this chapter, the testimony of a witness given in a contested civil action or special proceeding to which the person complained against is a party, or in whose behalf the action or proceeding is prosecuted or defended, may be received in evidence, so far as relevant and material to the issues in the disciplinary proceedings, by means of a duly authenticated transcript of such testimony and without proof of the nonavailability of the witness; provided, the board or administrative committee may order the production of and testimony by such witness, in lieu of or in addition to receiving a transcript of his testimony and may decline to receive in evidence any such transcript of testimony, in whole or in part, when it appears that the testimony was given under circumstances that did not require or allow an opportunity for full cross examination."

Cal.2d 834, 835 [31 Cal.Rptr. 478, 382 P.2d 598].) In 1940 petitioner was publicly reproved by the Board of Governors for gross negligence, in 1944 he was reprimanded by this court for the same type of misconduct (*Eschwig* v. *State Bar,* 24 Cal.2d 70 [147 P.2d 529]), and in 1951 he was disbarred for grand theft (Bar Misc. 2072). Petitioner was reinstated in 1958, and his misconduct giving rise to the present proceeding occurred shortly thereafter.

In *Bruns* v. *State Bar,* 18 Cal.2d 667, 673 [117 P.2d 327], another disbarment matter, this court said: "Although ten years have elapsed since the previous disciplinary proceedings against petitioner, in which he was suspended for a period of three months for deliberately misleading the court by a false averment as to custody of a minor in a petition for adoption, it is apparent that the discipline then administered did not succeed in imparting to him an understanding of the duties of an attorney to his clients and to the public."

It is ordered that petitioner be disbarred from the practice of law in this state and that his name be stricken from the roll of attorneys effective 30 days from the filing of the court's opinion.

Petitioner's application for a rehearing was denied November 19, 1969.