[No. S123042. June 23, 2005.]

In re RONALD ROBERT SILVERTON on Discipline.

COUNSEL

David A. Claire for Petitioner Ronald Robert Silverton.

Marie M. Moffat, Richard J. Zanassi and Jay M. Goldman for Respondent State Bar of California.

OPINION

**BAXTER, J.**—In 1975, this court ordered petitioner Ronald Robert Silverton disbarred based on his felony convictions for conspiracy to obtain money by false pretenses and to present a fraudulent insurance claim as well as for soliciting another to commit or join in the commission of grand theft. (*In re Silverton* (1975) 14 Cal.3d 517, 519 [121 Cal.Rptr. 596, 535 P.2d 724].) After three unsuccessful applications, petitioner was reinstated as a member of the State Bar on October 6, 1992. Less than two years later, he began a series of client transactions that became the subject of another disciplinary proceeding charging violations of rules 3-300 and 4-200 of the Rules of Professional Conduct.[1] The Review Department of the State Bar Court (Review Department) ultimately concluded that petitioner violated rule 4-200 with respect to three matters and violated rule 3-300 with respect to one other matter and recommended that petitioner be placed on two years' stayed suspension and three years' probation with various conditions, including a 60-day period of actual suspension.

In determining the appropriate level of discipline to recommend to this court, the Review Department considered the Rules of Procedure of the State Bar, title IV, Standards for Attorney Sanctions for Professional Misconduct (Standards), including standard 1.7(a) (Effect of Prior Discipline (standard 1.7(a)). Standard 1.7(a) directs that the degree of discipline imposed on a member with a prior record of discipline "shall be greater than that imposed in the prior proceeding *unless* the prior discipline imposed was so remote in time to the current proceeding *and* the offense for which it was imposed was so minimal in severity that imposing greater discipline in the current proceeding would be manifestly unjust." (Italics added.) However, the Review Department declined to apply standard 1.7(a), which would have resulted in disbarment, based solely on its belief that "doing so would, in our view, be manifestly unjust, particularly in light of the fact that [petitioner]'s prior record is very remote in time."

Silverton petitioned for our review. (Cal. Rules of Court, rule 952(a).) We denied the petition but granted review on our own motion to settle important

---

[1] Unless otherwise noted, all further references to rules are to the Rules of Professional Conduct.

questions of law concerning the discipline of attorneys who had previously been disbarred and to consider whether the discipline recommended here was appropriate in light of the record as a whole. (Cal. Rules of Court, rule 954(a)(1), (5).) As explained below, we reject the Review Department's recommendation and conclude instead that Silverton should be disbarred for a second time.

## I

The procedural history of this disciplinary proceeding is lengthy but largely irrelevant to the issue presented here. We therefore need discuss only the misconduct found by the Review Department and the recommended discipline.

### The Hou Matter (Case No. 95-O-10829—Count 1)

On June 25, 1992, Janette Hou was injured in a traffic accident with a truck operated by Durham Transportation, Inc. (Durham). Janette retained Attorney David L. Watson to represent her and her children, Raymond and Philip, in their claims against Durham. Janette's mother-in-law, Fan Hou, also retained Watson. Under the retainer agreements, Watson was to receive a contingent fee of one-third of the gross recovery if the claims were settled before filing suit or demand for arbitration and 40 percent thereafter. The agreements also entitled Watson to one-third of any "excess medical pay" he was able to recover on their behalf.

Watson eventually filed a lawsuit against Durham and, on June 1, 1994, associated Silverton to assist in the Hou matter. Watson informed the Hous of this arrangement and assured them it would not result in an increase in fees. Later that month, Silverton arranged to settle the Hous' lawsuit against Durham for $16,500, of which $9,500 was allocated to Janette and her sons and $7,000 was allocated to Fan. After deducting attorney fees and costs, Janette's recovery was to be $5,500 and Fan's recovery was to be $4,000. Janette and her sons, however, had medical bills of $4,311; Fan had medical bills of $3,680.

Watson, in the meantime, had received $7,391 in medical payment coverage from the Hous' automobile insurer, 20th Century Insurance. From this sum, Watson deducted $2,470.32 as fees[2] and placed the remaining $4,910.68

---

[2] Because Watson is not a party to this proceeding, we do not consider here the propriety of his conduct in contracting for, charging, and collecting a one-third fee on the medical payments that the Hous received from their insurance carrier, when there was never a dispute as to the Hous' entitlement to those benefits or as to the dollar amount of benefits the Hous were entitled to receive.

in his trust account.[3] Of this latter amount, Janette and her sons were allocated approximately $2,557, and Fan was allocated approximately $2,353. Thus, after taking into account medical bills and the medical payments from 20th Century Insurance, Janette's net recovery was $3,746 ($5,500 minus $4,311 plus $2,557), and Fan's net recovery was $2,673 ($4,000 minus $3,680 plus $2,353).

At that point, Silverton proposed, and Janette and Fan signed, an "AUTHORIZATION TO COMPROMISE DOCTOR'S BILL," which gave the Silverton Law Offices the right to compromise their medical bills "and keep the amount saved by said compromise as an addition to its fees and costs for handling said accident case." In return, Silverton offered Janette an additional $254, increasing her recovery from $3,746 to $4,000, and offered Fan an additional $327, increasing her recovery from $2,673 to $3,000. The authorization recited that it was "given in consideration for the fact that the Silverton Law Offices has reduced the medical bills in considering the disbursement to me and has accepted as its risk the possibility that the doctor may not compromise to the extend [sic] I have been benefitted [sic] by the consideration of said compromise on the Disbursement Sheet." Silverton distributed the settlement proceeds to Janette and Fan in checks dated August 30, 1994. The settlement drafts, however, were not actually issued by Durham until September 8, 1994.

Silverton eventually compromised all of the medical charges, which were originally $7,991, for $5,500. As a result, Silverton retained, in addition to the sums provided in the original contingent fee agreement, a total of $1,910, which represented the reduction in the medical bills ($2,491) less the amount advanced to the Hous ($581). In other words, Silverton retained over three-quarters of the reduction in the medical bills.

The Review Department determined that the arrangement involving a compromise of the medical bills was a business transaction, in that "the authorization to compromise constituted an immediate transfer from the Hous of both the ownership and possessory interest in all funds remaining after payment to the Hous of their distributive share of the settlement proceeds and the payment of attorney fees as called for in the original retainer agreement" in exchange for an upfront payment by the attorney. The transaction was therefore barred unless Silverton could show that "(A) The transaction or acquisition and its terms are fair and reasonable to the client and are fully disclosed and transmitted in writing to the client in a manner which should reasonably have been understood by the client; and [¶] (B) The client is advised in writing that the client may seek the advice of an independent

---

[3] The whereabouts of the remaining $10, as the Hearing Department of the State Bar Court (Hearing Department) noted, is a mystery.

lawyer of the client's choice and is given a reasonable opportunity to seek that advice; and [¶] (C) The client thereafter consents in writing to the terms of the transaction or the terms of the acquisition." (Rule 3-300; see generally *Fletcher v. Davis* (2004) 33 Cal.4th 61, 69–70 [14 Cal.Rptr.3d 58, 90 P.3d 1216].) The Review Department determined that Silverton (1) failed to disclose to the Hous information necessary for a reasonable understanding of the transaction, (2) failed to provide the Hous with written notice of their right to seek independent legal counsel, and (3) failed to discharge his burden to show the transaction was fair and reasonable to the Hous. In particular, Silverton failed to share with his clients, as he had with cocounsel Watson, his confidence that the medical bills could be compromised at a lower amount. (See *Mayhew v. Benninghoff* (1997) 53 Cal.App.4th 1365, 1369 [62 Cal.Rptr.2d 27].) In addition, the Review Department found that Silverton committed uncharged violations of rule 4-100 by giving the Hous their settlement checks, which were drawn on Silverton's client trust account, more than a week before Durham actually paid the settlement.

*The Kelly and de Jonge Matters (Case No. 95-O-10829—Count 5)*

On November 6, 1995, Wilma Kelly (Kelly) and Verna de Jonge (de Jonge) each retained Silverton to represent them and their respective children, who had suffered injuries in an automobile accident the previous day. Each agreement provided that Silverton was to represent these parties "as their attorney at law in a cause of action against all responsible parties and/or whosoever may be liable, arising out of an auto accident that occurred on 11/5/95"; granted him "a special power of attorney to settle or compromise any claim on Client's behalf which, in Attorney's sole judgement [*sic*] is fair and reasonable"; and entitled him, as his attorney fees for the services described, one-third of any amounts recovered by way of settlement or otherwise, if the matter was settled before suit or request for arbitration is filed, and 40 percent of any amounts recovered thereafter. Each agreement also provided that Silverton "may, at his sole discretion, compromise any medical bill, and said Attorney may retain *as an additional fee* the difference between the compromised amount and the bill for medical services, if anything."

Silverton settled the Kelly claims for $12,000. After deducting $4,000 in attorney fees and $120 in costs, the Kelly recovery was $7,880—which was less than the medical bills of $7,900. In February 1996, Silverton proposed to increase the Kelly share of the settlement by offering to pay them $2,500 out of his fees for the right to compromise the medical bills. In proposing this postsettlement agreement, Silverton represented that he already had the right, under the November 1995 retainer agreement, to compromise the Kelly medical bills and to retain any savings. Kelly accepted the offer. This postsettlement agreement was not in writing.

Silverton achieved a compromise of the medical bills at $4,388, for a savings of $3,512. After learning that Silverton had obtained such a large reduction in the medical bills, Kelly asked for a share. Silverton paid her an additional $500; "according to [Silverton], he paid Kelly the additional $500 out of the empathy he had for her over her financial plight."

Silverton also settled the de Jonge claims for $12,000. After deducting $4,000 in attorney fees and $120 in costs, the de Jonge recovery was $7,880; after subtracting the medical bills of $5,873, the net recovery was $2,007. In February 1996, Silverton proposed to increase the de Jonge recovery from $2,007 to $2,500 by offering an additional $493 for the right to compromise the medical bills and to retain any resulting savings. Silverton advised de Jonge, as he had done with Kelly, that he already had the right, under the retainer agreement, to compromise the medical bills and keep any savings. De Jonge accepted the offer and, as with Kelly, the postsettlement agreement was not in writing. The record is silent as to whether Silverton was able to compromise the de Jonge medical bills.

The Review Department rejected the Hearing Department's finding that rule 3-300 was violated by the provision in the *retainer* agreements that permitted Silverton to compromise the Kelly and de Jonge medical bills and keep any savings as an additional fee but did agree with the Hearing Department that this provision was an agreement for an unconscionable fee, in violation of rule 4-200. Although Silverton was "entitled to contract for, charge, and collect *a reasonable fee* for providing that service," he "did not do so. He unequivocally contracted for a *100 percent* contingency fee of any reduction he was able to negotiate. At least within the context of the present case, that fee is clearly unreasonable, unconscionable, and improper." The Review Department also found that Silverton committed an uncharged violation of rule 3-300 by failing to disclose the terms of the Kelly and de Jonge postsettlement agreements in writing, failing to obtain their written consent to the transaction, failing to advise them of their right to seek independent counsel or to give them the opportunity to seek such advice, and failing to establish the fairness of the transaction.

*The Belenki Matter (Case No. 99-O-13251—Count 2)*

On May 28, 1999, Boris Belenki (Belenki) retained Silverton to represent him in connection with personal injuries Belenki suffered in an auto accident on May 25, 1999. The retainer agreement recited that Belenki had retained Silverton "to represent him as his attorney at law in a cause of action against all concerned parties and/or whomsoever may be liable, arising out of auto accident of 5/25/99" and stated that Silverton was to receive, as his attorney fees for the services described in the agreement, one-third of any amounts

recovered prior to filing suit and 40 percent of any amount recovered thereafter. The agreement also contained the provision, like that in the Kelly and de Jonge agreements, authorizing Silverton to compromise the client's medical bills and retain any savings as "an additional fee."

In October 1999, Silverton settled Belenki's claims for $8,150. After deducting attorney fees of $2,717 and $81 in costs, Belenki's recovery was $5,352; after deducting medical bills of $4,250, Belenki's net recovery was $1,102. Silverton proposed to increase Belenki's recovery from $1,102 to $2,000 by offering an additional $898 for the right to compromise Belenki's medical bills and retain any savings. Belenki accepted and executed an "AUTHORIZATION TO COMPROMISE MEDICAL BILLS," which stated that the additional payment to Belenki was "given in consideration for the fact that the SILVERTON LAW OFFICES has accepted as its risk the possibility that payment [of some of the medical bills] ma[y] be required from the attorney's fee" and recited that Belenki "has been informed that [he] may consult with any other attorney concerning this matter and has declined to do so."

Silverton succeeded in reducing Belenki's medical bills from $4,250 to $2,717, for a savings of $1,533.

As in the Kelly and de Jonge matters, the Review Department rejected the Hearing Department's finding that the retainer agreement had violated rule 3-300 but did find that "the challenged provision permitting [Silverton] to compromise Belenki's medical bills and to keep 100 percent of the negotiated savings as an additional fee was an agreement for an unconscionable fee" in violation of rule 4-200. The Review Department also found that the post-settlement agreement constituted an uncharged violation of rule 3-300 and that the issuance of a settlement check to Belenki before the defendant insurer had paid the settlement constituted an uncharged violation of rule 4-100.

### Recommended Discipline

The Review Department recommended that Silverton be suspended from the practice of law for two years; that execution of the two-year suspension be stayed; and that he be placed on probation for three years with various conditions, including an actual suspension of 60 days—a "minor sanction." (*In re Morse* (1995) 11 Cal.4th 184, 209 [44 Cal.Rptr.2d 620, 900 P.2d 1170].) The Review Department found, as aggravating factors, his prior disbarment (std. 1.2(b)(i)); the existence of multiple acts of misconduct (std. 1.2(b)(ii)); three uncharged violations of rule 3-300 with respect to the postsettlement agreements with Kelly, de Jonge, and Belenki (see *Edwards v.*

*State Bar* (1990) 52 Cal.3d 28, 36 [276 Cal.Rptr. 153, 801 P.2d 396] ["evidence of uncharged misconduct was relevant to establish a circumstance in aggravation"]); and three uncharged violations of rule 4-100 involving Silverton's payment to Belenki and to the Hous of their shares of the settlement proceeds prior to the deposit of the settlement funds in the client trust account. The Review Department found, as mitigating factors, that Silverton actually and reasonably believed that he was entitled to negotiate the postsettlement agreements at arm's length (std. 1.2(e)(ii)) and that no party suffered significant harm (std. 1.2(e)(iii)).

The Review Department granted the State Bar's request to take judicial notice of Silverton's prior disbarment. Yet, in selecting the appropriate sanction, the Review Department declined to rely on standard 1.7(a), which "would require that we recommend [Silverton]'s disbarment. . . . [D]oing so would, in our view, be manifestly unjust, particularly in light of the fact that [Silverton]'s prior record of discipline is very remote in time." The Review Department then turned to standard 2.7, which provides that an attorney's culpability of a willful violation of rule 4-200, such as entering into fee agreements for an unconscionable fee, "shall result in at least a six-month actual suspension from the practice of law, irrespective of mitigating circumstances." But the Review Department declined to rely on this standard, either. Ultimately, it chose to follow *In the Matter of Hultman* (Review Dept. 1995) 3 Cal. State Bar Ct. Rptr. 297, which it deemed a "comparable" case to Silverton's and in which the recommended discipline was an actual 60-day suspension. Attorney Hultman, however, was charged only with a single count of violating rule 3-300 and did not have a prior record of discipline, let alone a disbarment.

## II

We have undertaken an independent determination of the law and facts in this matter (*In re Rose* (2000) 22 Cal.4th 430, 457 [93 Cal.Rptr.2d 298, 993 P.2d 956]) and accept and adopt the conclusions of the Review Department that Silverton violated rule 3-300 with respect to the Hou matter and rule 4-200 with respect to the Kelly, de Jonge, and Belenki matters. The only issue before this court is the appropriate form and degree of discipline for this misconduct. (*In re Brown* (1995) 12 Cal.4th 205, 215 [48 Cal.Rptr.2d 29, 906 P.2d 1184].)

In attorney discipline matters, we generally accord great weight to the Review Department's recommendation. (*In re Morse, supra,* 11 Cal.4th at p. 205.) Nevertheless, the State Bar Court's findings and recommendations are merely advisory. (*In re Rose, supra,* 22 Cal.4th at p. 442.) "[T]he ultimate decision rests with this court, and we have not hesitated to impose a harsher

sanction than recommended by the department." (*Blair v. State Bar* (1989) 49 Cal.3d 762, 776 [263 Cal.Rptr. 641, 781 P.2d 933].) " '*When the facts have warranted doing so, we have even rejected a recommendation of suspension and disbarred the attorney.*' " (*In re Morse, supra,* 11 Cal.4th at p. 205.) By granting review on our own motion in this case, we have indicated reservations about the level of discipline that the Review Department intended to impose. (*In re Brown, supra,* 12 Cal.4th at p. 217.) We now conclude that those reservations were justified.

In seeking disbarment, the State Bar relied below, as it does here, on standard 1.7(a), which provides: "If a member is found culpable of professional misconduct in any proceeding in which discipline may be imposed and the member has a record of one prior imposition of discipline as defined by standard 1.2(f), the degree of discipline imposed in the current proceeding shall be greater than that imposed in the prior proceeding *unless* the prior discipline imposed was so remote in time to the current proceeding *and* the offense for which it was imposed was so minimal in severity that imposing greater discipline in the current proceeding would be manifestly unjust." (Italics added.) The Review Department acknowledged standard 1.7(a) but nonetheless recommended a *lesser* degree of discipline. Its entire justification consisted of the following: "Applying standard 1.7(a) in the present proceeding would require that we recommend [Silverton]'s disbarment. However, doing so would, in our view, be manifestly unjust, particularly in light of the fact that [Silverton]'s prior record of discipline is very remote in time. [Silverton]'s prior discipline was imposed on him in 1975 for convictions that occurred in 1972. In sum, we decline to apply standard 1.7(a)."

■ We do not find the Review Department's justification convincing. In determining whether the prior discipline was remote in time, one "should not simply consult the Gregorian calendar with blinders on." (*People v. Humphrey* (1997) 58 Cal.App.4th 809, 813 [68 Cal.Rptr.2d 269]; see *Pearlin v. State Bar* (1963) 59 Cal.2d 834, 835 [31 Cal.Rptr. 478, 382 P.2d 598] [relying on disbarment 22 years earlier].) Although Silverton was disbarred in 1975, he was not reinstated as a member of the bar until October 1992. Less than two years later, Silverton violated rule 3-300 with respect to the postsettlement agreement with the Hous. Thus, although 19 years elapsed between Silverton's disbarment and his new misconduct, he was ineligible to practice law for all but 22 months of that period. We therefore accord little weight to the remoteness of the prior discipline. (*Eschwig v. State Bar* (1969) 1 Cal.3d 8, 19 [81 Cal.Rptr. 352, 459 P.2d 904]; accord, *In re Quaid* (La. 1994) 646 So.2d 343, 351.)

The Review Department's analysis also failed to acknowledge that the exception to standard 1.7(a)'s requirement of greater discipline for recidivist

attorneys is stated in the conjunctive. That is, the standard provides that "greater" discipline shall be imposed unless "the prior discipline imposed was so remote in time to the current proceeding *and* the offense for which it was imposed was so minimal in severity that imposing greater discipline in the current proceeding would be manifestly unjust." (Italics added.) The Review Department made no finding that Silverton's prior misconduct was so minimal in severity that imposing greater discipline in the current proceeding would be manifestly unjust, nor would such a finding be supported by a review of the prior disciplinary proceeding.

Silverton was disbarred in 1975 because he was convicted of two felonies: one count of conspiracy to obtain money by false pretenses and to present a fraudulent insurance claim, and one count of soliciting another to commit or join in the commission of grand theft. (*In re Silverton, supra,* 14 Cal.3d at p. 519.) As we previously pointed out, Silverton's prior disciplinary offenses were "serious crimes involving moral turpitude [citation]; and disbarments, rather than suspension, have been the rule, rather than the exception, in such cases." (*In re Silverton, supra,* 14 Cal.3d at p. 523.) It follows that this proceeding does not fall within the exception specified in standard 1.7(a).

This, however, does not exhaust our inquiry. As Silverton points out, the Standards " 'are not binding on us, but they promote the consistent and uniform application of disciplinary measures.' " (*In re Morse, supra,* 11 Cal.4th at p. 206.) Thus, we have said that "we will not reject a recommendation arising from application of the Standards unless we have grave doubts as to the propriety of the recommended discipline." (*Lawhorn v. State Bar* (1987) 43 Cal.3d 1357, 1366 [240 Cal.Rptr. 848, 743 P.2d 908].) The issue here, though, is not whether to follow a recommendation from the Review Department that arises from the *application* of the Standards. As explained above, a plain-language application of the Standards would lead to disbarment. We must instead consider how to approach the recommended discipline when the Standards point to the imposition of a particular degree of discipline but the Review Department has nonetheless recommended a lesser sanction.

We begin, as we typically do, by looking to the purpose of sanctions for attorney misconduct. " 'The primary purposes of disciplinary proceedings conducted by the State Bar of California and of sanctions imposed . . . are the protection of the public, the courts and the legal profession; the maintenance of high professional standards by attorneys and the preservation of public confidence in the legal profession.' " (*In re Morse, supra,* 11 Cal.4th at p. 205, quoting std. 1.3.) These concerns are at their zenith in the case of an attorney who has previously committed an offense serious enough to justify disbarment and is again found to have departed from the Rules of Professional Conduct. Disbarment delivers a message, in unmistakable terms, to the

individual attorney as well as to attorneys generally concerning the trust reposed by the public in the profession and the corresponding duty of bar members to adhere to the highest ethical standards. When an attorney who is in receipt of that message is again at odds with professional standards, whether deliberately or by want of care, we must respond with appropriate seriousness.

■ The appropriate seriousness is suggested by standard 1.7(a), which in effect recommends disbarment in such cases unless the prior disbarment was so remote in time and based on such a minor offense that a second disbarment would be manifestly unjust. While we agree with Silverton that the Standards are not binding on us (*Arm v. State Bar* (1990) 50 Cal.3d 763, 774 [268 Cal.Rptr. 741, 789 P.2d 922]), we also have said that they are entitled to " 'great weight.' " (*In re Brown, supra,* 12 Cal.4th at p. 220.) As the State Bar argues, "[w]here an attorney has been disbarred, reinstated, and then again engages in serious misconduct, there is clearly a demonstrated inability to conform to the ethical standards required of all members of the profession." (See also *Eschwig v. State Bar, supra,* 1 Cal.3d at p. 19.) In the context of an attorney who has already once been disbarred, additional exceptions to the discipline specified in standard 1.7(a) should be elaborated with care. (Cf. *In re Young* (1989) 49 Cal.3d 257, 267, fn. 11 [261 Cal.Rptr. 59, 776 P.2d 1021] ["the State Bar Court should follow the guidance of the Standards for Attorney Sanctions whenever possible"].) Accordingly, we conclude that when an attorney has previously been disbarred, disbarment is the appropriate sanction for subsequent professional misconduct unless the exception set forth in standard 1.7(a) is satisfied *or* the attorney can otherwise establish "grave doubts as to the propriety" of disbarment in the particular case. (*Lawhorn v. State Bar, supra,* 43 Cal.3d at p. 1366.)

In this context, the burden should be on the attorney to demonstrate the existence of extraordinary circumstances justifying a lesser sanction. Silverton has failed to discharge his burden.

Silverton's misconduct was neither minor nor isolated. In addition to the multiple acts of misconduct evidenced by both the charged and uncharged acts, the provision entitling him to 100 percent of any reduction he could obtain on the client's medical bills appeared to have been a standard clause in the retainer he routinely offered to clients. Moreover, even if we were to credit the Review Department's conclusion that Silverton honestly and reasonably believed he had the right to negotiate the postsettlement agreements at arm's length, there is no evidence to suggest that Silverton reasonably believed his remaining misconduct was nonetheless proper. Indeed, the Review Department made an express finding that Silverton "did not act in good faith when he relied on the retainer agreements to 'induce' Kelly and

de Jonge to enter into the post-settlement agreements." The Review Department also found, "[w]ithout question," that the uncharged postsettlement agreements were subject to rule 3-300, which means that Silverton could not reasonably have believed he was free to enter into such transactions with his clients without obtaining their informed written consent. Finally, Silverton could not reasonably have believed that he was entitled, as part of the retainer, to negotiate a contingency fee that permitted him to compromise a client's medical bills and keep 100 percent of the negotiated savings as an additional fee. In sum, as to most of the charged and uncharged misconduct, Silverton lacked an objectively reasonable, good faith belief that his actions were proper. He therefore was entitled only to minimal mitigation under standard 1.2(e)(ii) (*Sternlieb v. State Bar* (1990) 52 Cal.3d 317, 331 [276 Cal.Rptr. 346, 801 P.2d 1097]) and, in light of the aggravating factors, has not demonstrated extraordinary circumstances warranting a lesser sanction.[4]

To the contrary, the most extraordinary aspect of this proceeding is petitioner's apparent lack of insight into the wrongfulness of his actions, especially as to the rule 4-200 violations. Silverton argued in his petition to this court, as he did below, that he never intended to enforce the literal language of the offending provision in the Kelly, de Jonge, and Belenki retainer agreements, nor did he intend that the offending provision would constitute the full agreement on the matter of compromising their medical bills. In his view, the offending provision should be viewed in light of the

---

[4] Although we conclude that the Review Department's findings of misconduct are sufficient to justify a sanction of disbarment, we do note from the facts developed in the record that the Office of Chief Trial Counsel (OCTC) could have—but failed to—charge Silverton with violating rule 3-300 with respect to the postsettlement agreements he negotiated with Kelly, de Jonge, and Belenki. Likewise, the OCTC could have—but failed to—charge Silverton with violating rule 4-100 with respect to the issuance of settlement checks to Belenki and the Hous before the settling defendants had tendered their payments. Because of these omissions, the State Bar Court could consider this conduct only as an aggravating circumstance and not as an independent basis of discipline.

The OCTC's failure to offer other evidence in a timely manner also may have hindered the State Bar Court's assessment of the gravity of Silverton's conduct. For example, the State Bar Court could not consider, even as an aggravating circumstance, the OCTC's allegation that the Kelly and de Jonge retainer agreements violated rule 4-200. As the Review Department explained, the OCTC had been aware of the offending provisions since at least April 1997 but had failed to charge a rule violation or to identify them as an aggravating circumstance in the Hearing Department, depriving Silverton of adequate notice of the claim. The State Bar Court was likewise unable to consider as aggravating circumstances the bad acts found in Silverton's two prior unsuccessful reinstatement proceedings because the OCTC, once again, failed to raise the issue in the Hearing Department.

We do not, of course, rely on these factors in reaching our decision here. Nor do we suggest that the OCTC should engage in speculative overcharging. Nevertheless, given the time over which this case was developed and prosecuted by that office, it would have been helpful if all potentially meritorious allegations of rule violations had been clearly and succinctly included in the pleadings.

postsettlement agreement reached in each of those matters; he contends, therefore, that this finding of misconduct is without support.

Silverton's interpretation ignores not only the text of rule 4-200(B), which directs us to evaluate the unconscionability of a fee "on the basis of all the facts and circumstances *existing at the time the agreement was entered into*" (italics added), but also the finding below that his testimony concerning his subjective understanding of the offending provision was not credible. (See *In re Morse, supra,* 11 Cal.4th at p. 211.) As the Review Department observed, "[Silverton]'s contentions are belied by the fact that he clearly relied on and used the challenged provision to 'induce' Kelly and de Jonge to enter into the post-settlement agreements by telling them that the retainer agreements which they signed in November 1995 *already* authorized him to compromise their medical bills and to keep any savings." Silverton's defense thus rested not "on a good faith belief that the charges were unfounded, but on a blanket refusal to acknowledge the wrongfulness of conceded conduct." (*Carter v. State Bar* (1988) 44 Cal.3d 1091, 1101 [245 Cal.Rptr. 628, 751 P.2d 894].)

In our opinion ordering Silverton's first disbarment, we found it "significant" that he had "failed to show any remorse and has devoted his efforts chiefly to an attempt to show that there was a complete lack of evidence in the trial court pointing to his guilt of the crimes of which he was convicted." (*In re Silverton, supra,* 14 Cal.3d at p. 523.) Now, 30 years later, it appears little has changed.[5]

In such circumstances, a serious sanction must be imposed both to protect the public, the courts, and the profession as well as to deter the recalcitrant attorney from future wrongdoing. Absent a finding that the prior offense was remote in time and relatively minor or that other extraordinary circumstances warranted leniency, the sanction that is "most likely to protect the public, the courts, and the profession" and "deter . . . from future wrongdoing" an attorney who has previously been disbarred (*In re Morse, supra,* 11 Cal.4th at p. 210) is disbarment. (See also *The Florida Bar v. Dodd* (Fla. 1967) 195 So.2d 204 ["we find the repetition of misconduct to merit disbarment"].) Because no extraordinary circumstances exist here, we conclude that the Review Department's recommendation of 60 days' actual suspension is inadequate.

---

[5] Silverton argues also that his misconduct caused only "minimal harm" to his clients. We decline to place much weight on that factor here since, as the Review Department noted, "[i]t is, at best, difficult to find any benefit to the clients in such an agreement," either.

## Disposition

It is hereby ordered that Ronald Robert Silverton be disbarred from the practice of law and that his name be stricken from the roll of attorneys. He is also ordered to comply with rule 955 of the California Rules of Court and to perform the acts specified in subdivisions (a) and (c) of that rule within 30 and 40 days, respectively, after the date this order is effective. Costs are awarded to the State Bar.

George, C. J., Kennard, J., Werdegar, J., Chin, J., Brown, J., and Moreno, J., concurred.