[L.A. No. 32260. July 13, 1987.]

JEROME B. ROSENTHAL, Petitioner, v.
THE STATE BAR OF CALIFORNIA, Respondent.

**COUNSEL**

Jerome B. Rosenthal, in pro. per., for Petitioner.

Herbert M. Rosenthal, Truitt A. Richey, Jr., Richard J. Zanassi and Arthur Margolis for Respondent.

## OPINION

**THE COURT.***—This is a proceeding to review the unanimous recommendation of the Review Department of the State Bar Court (Review Department)[1] that petitioner Jerome B. Rosenthal be disbarred from the practice of law in California and that he comply with the requirements of rule 955, California Rules of Court.

The Hearing Panel[2] of the State Bar Court (Hearing Panel) unanimously recommended petitioner's disbarment and the Review Department unanimously adopted the panel's findings of fact and conclusions of law in making its recommendation. As shall appear, we conclude that the Review Department's recommendation of disbarment should be adopted.

## I.

In December 1985 the Hearing Panel, after consideration of more than 80 days of testimony and documentary evidence, unanimously concluded that petitioner was culpable in 13 separate counts of misconduct and recommended disbarment. In May 1986 the Review Department filed its decision in accord.

Petitioner was found by both the Hearing Panel and the Review Department to have engaged in improper conduct during his representation of Doris Day Melcher, her late husband, Martin Melcher, her son Terrence Melcher, and various of their family-owned corporations. Petitioner was found to have: engaged in transactions rife with undisclosed conflicts of interest, taken positions adverse to former clients, overstated expenses and double-billed for legal fees, failed to return client files or provide access to

---

*Before Panelli, Acting P. J., Broussard, J., Arguelles, J., Eagleson, J., Kaufman, J., Lillie (Mildred L.), J.,† and Spencer (Vaino H.), J.‡

[1] The phrase State Bar Court shall be used herein to refer to the conjunction of the Hearing Panel and Review Department.

[2] Throughout the record, the Hearing Panel was referred to as the "Committee." We use the former, more commonly used and modern term.

---

†Presiding Justice, Court of Appeal, Second District, Division Seven, assigned by the Chairperson of the Judicial Council.

‡Presiding Justice, Court of Appeal, Second District, Division One, assigned by the Chairperson of the Judicial Council.

records, failed to give adequate legal advice or provide his clients with the opportunity to obtain independent counsel, filed fraudulent claims and given false testimony, and engaged in conduct intended to harass his former clients, delay court proceedings, obstruct justice and abuse the legal process.

The State Bar Court concluded that petitioner (a) wilfully violated his oath and duties as an attorney under Business and Professions Code section 6067[3] by failing to discharge faithfully these duties to the best of his knowledge and ability; (b) wilfully violated his duties as an attorney under section 6068, subdivision (c), by maintaining proceedings he knew to be unjust or illegal abuses of process; (c) wilfully violated his duties as an attorney under section 6068, subdivision (d), by employing untruthful means in furtherance of causes confided to him and by seeking to mislead the judge or judicial officer by artifice or false statements of fact; (d) wilfully violated his duties as an attorney under section 6068, subdivision (g), by encouraging the commencement and maintenance of proceedings with corrupt motive of passion or interest; (e) violated his duties as an attorney under section 6106 by committing acts involving moral turpitude or dishonesty; (f) violated his duties as an attorney under section 6077 by wilfully violating the following then-applicable Rules of Professional Conduct: (i) rule 4, by acquiring interests adverse to clients; (ii) rule 5, by accepting employment adverse to clients without their consent in matters in which he obtained confidential information by reason of or in the course of his employment by such clients; (iii) rule 6, by accepting employment without first disclosing his relation to an adverse party and his interest in the subject matter of the employment; (iv) rule 7, by representing conflicting interests without the consent of all parties concerned; (v) rule 13, by accepting and prosecuting cases solely for the purpose of harassing his clients and delaying them in prosecuting their claims against him; (g) violated other duties within the purview of sections 6067, 6068 and 6103 by failing to perform legal services competently, refusing to properly account to clients for property and funds under his control, and refusing to deliver to his clients properties under his control which they were entitled to receive.

We will review the procedural history of the State Bar proceedings that have contributed to the massive record before us. In December 1968 Doris Day Melcher and her son, Terrence Melcher, filed a complaint with the State Bar against petitioner, their former attorney. At their request, an investigation of the charges was deferred until September 1971, when the complainants renewed their allegations.

In February 1972 the State Bar formally advised petitioner of the existence and substance of the complaint against him. In April of that year,

---

[3] All further references, unless otherwise specified, are to this code. References to sections and rules will be to those in effect at the time of petitioner's relevant conduct.

petitioner answered. The matter was referred to the Hearing Panel, which calendared a preliminary hearing for late July. At the end of October, the panel ordered that a "Notice to Show Cause" be issued. A notice was prepared, signed by the panel, and, in mid-January 1973, served on petitioner, who filed his answer in mid-March.

Hearings before the Hearing Panel finally began in November 1974.[4] On March 5, 1975, at the fourth hearing session, the panel decided that the hearings would be postponed at least until a ruling by the Board of Bar Governors as to whether petitioner was entitled to appointed counsel by reason of indigency. Petitioner's request for appointed counsel was denied by the board on May 9, and review of that decision was denied by this court on January 14, 1976.[5]

Hearings resumed in March 1976, when the State Bar's trial examiner, Mr. Carr, announced the State Bar's election to present the case through written materials which were previously the subject of civil, probate, bankruptcy and tax proceedings between petitioner and the complainants. (See § 6049.2.)[6] Petitioner objected to the admission of any such materials on the

---

[4] The hearing date for the notice to show cause, originally continued to late March 1973, was set for late May. On May 30, it was continued again. On June 29, petitioner filed a notice requesting a substitution of examiner. On July 31, a hearing on that notice continued from August 15 to October 29 upon joint request. On September 18, petitioner filed a request to disqualify the examiner. On October 10, a hearing on petitioner's motions to dismiss and to disqualify the trial examiner was held. On October 29, the notice to show cause hearing was held; on November 2, the trial examiner withdrew. On January 29, 1974, Mr. Joseph L. Carr (now deceased) was appointed as trial examiner.

On April 16, petitioner requested that the formal hearings before the Hearing Panel be held in abeyance pending conclusion of the civil proceeding against him (Samet v. Day, an action initiated by petitioner, which was consolidated for trial with 12 other actions, 10 of which were also initiated by petitioner against the Melcher parties), which arose out of the same facts as those recited in the notice to show cause. On May 10, this request was granted; on September 18, the trial court announced its intended decision against petitioner in the civil matter. (In August 1985, the Court of Appeal unanimously affirmed the Samet v. Day decision in *Day* v. *Rosenthal* (1985) 170 Cal.App.3d 1125 [217 Cal.Rptr. 89]; a petition for rehearing was denied on Sept. 6, 1985, and we denied a petition for review on Oct. 16, 1985.)

Following yet another of petitioner's requests for a continuance, formal hearings commenced on November 6, 1974.

[5] Petitioner's request in a federal district court (Malcolm Lucas, Judge) for a temporary restraining order to prevent the prosecution of the bar proceedings against him until he could establish his claim of deprivation of his due process right to counsel was denied on March 16, 1976. Then Judge Lucas found, inter alia, "that the due process clause does not require the appointment and payment of counsel by the State Bar in bar disciplinary proceedings." The Hearing Panel thereafter denied petitioner's motion "requesting counsel on new facts," stating that it lacked jurisdiction to entertain such a motion and that the Supreme Court had already decided the indigency/counsel issues adversely to petitioner.

[6] Section 6049.2 provides: "In all disciplinary proceedings pursuant to this chapter [chapter 4 entitled "Attorneys"], the testimony of a witness given in a contested civil action or special proceeding to which the person complained against is a party, or in whose behalf the action

ground that he had no opportunity to cross-examine at the pertinent proceedings and that Judge Lester E. Olson, who tried Samet v. Day (see ante, fn. 4), was biased and prejudiced against him.[7]

After another delay of nearly one and one-half years attributable to petitioner's objections regarding the civil proceedings evidence, the Hearing Panel finally ruled, in July 1977, that the approximately 95 volumes of civil transcripts from the Samet v. Day proceeding would be admitted for the *limited purpose* of determining whether, under section 6049.2, the testimony contained therein was given under circumstances not allowing an opportunity for full cross-examination. After undertaking the mammoth task of reading these transcripts, the Hearing Panel, in April 1978, unanimously found that the testimony in these consolidated cases "in which cases [petitioner] was a party or in whose behalf those cases were prosecuted or defended, may be received in evidence by transcript so far as relevant and material to the issues in these proceedings. [¶] The [Hearing Panel] specifically [found] that such testimony was given under circumstances that required or allowed [petitioner] an opportunity for full cross examination." Thereafter, the State Bar offered any transcripts from the proceeding it deemed relevant and the panel considered petitioner's other objections at the time of each offer.

Petitioner thereafter objected continuously during the Hearing Panel proceeding on grounds of relevancy, and hearsay,[8] among others, to the State Bar's submission of the testimony of individual witnesses under section 6049.2. He also argued that the Hearing Panel could not take judicial notice of findings of fact, conclusions of law, orders or judgments in the underlying bankruptcy, probate, tax and civil proceedings. Petitioner further requested various continuances and injected the state of his health into the proceedings by arguing at length that he was not healthy enough to proceed. After hearing expert testimony and making its own observations as to petitioner's apparent good health, the Hearing Panel denied petitioner's motion for continuance based on his physician's declarations. Notwithstanding this

---

or proceeding is prosecuted or defended, may be received in evidence, so far as relevant and material to the issues in the disciplinary proceedings, by means of a duly authenticated transcript of such testimony and without proof of the nonavailability of the witness; provided, the board or administrative committee may order the production of and testimony by such witness, in lieu of or in addition to receiving a transcript of his testimony and may decline to receive in evidence any such transcript of testimony, in whole or in part, when it appears that the testimony was given under circumstances that did not require or allow an opportunity for full cross examination."

[7] Judge Olson, called as a witness on behalf of the State Bar, testified in several hearings. Petitioner extensively cross-examined him on, inter alia, the issue of possible bias.

[8] At one point, petitioner consumed several pages of transcript in objecting on hearsay grounds to a letter admittedly signed by himself.

adverse ruling and the fact that the State Bar concluded its evidentiary case against him in June 1979, petitioner refused the panel's direction to present his defense on the merits, preferring instead to subpoena, without notice to the panel, the panel's medical expert, Dr. Windsor, and to cross-examine him on what the panel considered a "dead issue." This examination was conducted in such a manner that, in the words of Hearing Panel Chairman Mitchell, "in some instances it almost appeared as though [petitioner] might be engaged in an attempt to harass the witness." After petitioner's subsequent subpoena of Dr. Windsor was quashed by the Hearing Panel, he devoted another full hearing to eliciting the expert testimony of a doctor who had never physically examined him and possessed no opinion as to whether he was fit to defend himself in the bar proceedings.

Yet another full hearing was devoted to petitioner's presentation of a motion to dismiss the proceedings by admonition. After it denied this motion, the panel, at this November 1979 hearing, implored petitioner to present evidence in his defense at the next hearing.[9] At the next hearing, following a preliminary statement consuming over 10 pages of transcript and reiterating objections he had made during the course of the lengthy proceedings, petitioner moved to extend the hearing schedule so that at least 45 days would elapse between each future hearing. After this motion was denied, petitioner finally commenced his defense.[10] In February 1981, Chairman Mitchell announced the resignation of Hearing Panel member Palmer due to the move of his law practice and home to Fresno.

Evidence presented by petitioner in defense consisted largely of his own testimony, that of his law firm's accountant, Walter Harrison, and that of numerous lawyers involved in the representation of petitioner and the Rosenthal parties at the trial and appellate levels in the underlying litigation. Petitioner also put on testimony by his ex-wife, another longtime acquaint-

---

[9] The following exchange took place at the hearing's conclusion: Chairman Mitchell: "We understand. Mr. Rosenthal, you are ready to proceed with some evidence?"

Mr. Rosenthal: "Not this evening. It's 10 minutes after 8:00, and I don't want to tell you men that I'll be ready to present at the next time. I'll just pursue my rights as I'm best able and as I see them."

Chairman Mitchell: "It seems, Mr. Rosenthal, that we are going to have to proceed with some evidence in the defense of this matter on some occasion sometime. We have asked you on a number of occasions to do that. You are either going to produce evidence in support of your defense in these proceedings or not. And if you elect not to, then we will simply have to close the proceedings and determine it on the evidence which has been produced."

Mr. Rosenthal: "A-ha."

Chairman Mitchell: "So we once again beg you, implore you, suggest, request, hope and expect, and I'm not trying to be facetious when I use those words, we ask again that you be ready to produce evidence at the next hearing in these proceedings. . . ."

[10] At the conclusion of the disciplinary proceedings, and again before this court, petitioner argued that there were unreasonable delays in the State Bar proceedings.

ance (who happened to be a disbarred attorney), and the data processing service operator who installed his law firm's record keeping equipment. A large portion of petitioner's defense was directed to the issue, raised by count II of the notice to show cause, whether his petition for removal of Terrence Melcher as administrator of Martin Melcher's estate was filed without basis in law or fact; count II was the single count upon which petitioner ultimately prevailed in these proceedings.

Throughout petitioner's defense, he frequently reraised claims about his ill health and "brain pain" attacks, and at one point actually sought to *reopen* the section 6049.2 issue that had taken the Hearing Panel so long to resolve. After petitioner had exhausted his list of witnesses and consumed the first of four consecutive hearings consisting solely of his own testimony and taking place over the better part of three months, he issued a belated subpoena duces tecum on January 12, 1982, in an attempt to compel the Los Angeles County Clerk to produce all of the exhibits used in the underlying Samet v. Day case. These exhibits were described by the clerk's attorney as consisting of 83 Bekins-type packing boxes full of documents.

It was noted at the November 16, 1982, hearing that Mr. Carr, the State Bar's trial examiner from the inception of the proceedings, had passed away and that Arthur Margolis had been substituted in his place. Subsequently, several hearings were devoted to resolving the county clerk's resistance to the subpoena duces tecum in light of the fact that it was unclear whether petitioner could or would pay for reproduction of the voluminous exhibits. The matter was finally solved by the State Bar Court's willingness to inspect the necessary documents and hold the necessary hearings on the premises of the county courthouse pursuant to an arrangement whereby the State Bar Court would compensate the county's custodian of the records for necessary overtime. After denial by Assistant Presiding Referee Fried of petitioner's motion to continue and hold the proceedings in abeyance, apparently pending appellate resolution of the Samet v. Day matter, petitioner sought another continuance based on a two-year-old medical declaration concerning the condition of his heart, which was denied.

Petitioner's motion to reopen to call further witnesses, including Doris Day, was denied by the Hearing Panel on February 2, 1983, and the panel scheduled May 1 as the due date for the State Bar's opening written brief, to which petitioner was to have 60 days to respond, followed by the bar's reply brief in another 30 days. Due to Mr. Carr's untimely death, the voluminousness of the record, and Margolis's unfamiliarity with the case, the State Bar was unable to make this deadline. On February 29, 1984, upon a joint motion for continuance, the Hearing Panel ordered the proceedings to be held in abeyance for 90 days while the parties sought a stay from Chief

Presiding Referee George. After denial of the motion, the Hearing Panel, at the final August 16, 1984, hearing, established a final briefing schedule allowing the State Bar 90 days to submit its brief and respondent 120 days thereafter to respond.

## II.

Petitioner is, and at all relevant times was, an attorney licensed to practice law in California. At all times relevant to his association with the Melchers, petitioner practiced law under his own name or with law firms containing his name. He has no prior record of discipline.

In May 1956, petitioner entered into a retainer agreement with Doris Day Melcher and continued to represent her as an attorney, business manager, business advisor and agent until his services were terminated in July 1968. About the time of the Day retainer agreement, petitioner entered into a retainer agreement with Day's husband, Martin Melcher, and assumed similar responsibilities until Melcher's death in 1968. During the same period, petitioner also represented several corporations in which the Melchers owned an interest, including: Arwin Productions, Inc., Daywin Music, Inc., Artists Music Inc., and Martin Melcher Productions, Inc.

After Martin Melcher's death in 1968, petitioner represented Terrence Paul Melcher, who was the personal representative of his father's estate, as his attorney. Terrence Melcher discharged petitioner in May 1968.

### A. *Petitioner's Failure to Account and Return Records*

The trial court in Samet v. Day found that throughout the period during which petitioner represented the Melchers, Day and Melcher were neither sophisticated investors nor experienced in business affairs and were dependent on petitioner for legal and business advice, and susceptible to his influence. The State Bar Court found that during the period in which petitioner represented the Melchers, he prepared, maintained and controlled numerous files and records important to the personal and business affairs of the Melchers. Following petitioner's termination as the Melchers' attorney, numerous requests and demands were made by and on behalf of the Melchers for the return of these files and records and for an accounting of their affairs. Petitioner, however, refused to return all of his former clients' records and files or to render an accounting. As a consequence of petitioner's conduct, the Melchers had to petition the court for a receiver, who was appointed to obtain the records. Petitioner still resisted, and sheriff's deputies were summoned to his office to take possession of the files

and records when he refused to unlock the file room to provide access. The foregoing proceedings resulted in substantial expenses to the Melchers.

The Samet v. Day trial court set forth detailed findings evidencing the numerous requests for the Melchers' records made on petitioner, petitioner's conduct necessitating appointment of a receiver, and petitioner's refusal to cooperate with the receiver.[11] The Melchers incurred damages of $169,330 as a direct and proximate result of petitioner's wrongful retention of the records. Of this amount, approximately $67,000 was paid to the court-appointed receiver for his services. The trial court further concluded that all information relating to the Melchers' business ventures and investments came from and was available only through petitioner.

The State Bar Court found that, while intentionally refusing the Melchers access to pertinent records, petitioner also filed various claims asserting ownership interests, profit shares and other proprietary rights in certain Melcher business ventures. The State Bar Court concluded that petitioner's refusal to furnish records or access to records was unreasonable, unjustified and intended to harass the Melchers and delay and prejudice their defense of his claims.

---

[11] Section 6049.1 provides in pertinent part: "In all disciplinary proceedings in this State, certified or duly authenticated copies of findings, conclusions, orders or judgments made or entered in any court of record, or any body authorized by law or by rule of court to conduct disciplinary proceedings against attorneys, of the United States, of any State or Territory of the United States or of the District of Columbia in any disciplinary proceeding therein against the same person, shall be admissible in evidence, and so far as relevant and material shall be prima facie evidence of the facts, matters and things set forth therein."

Petitioner attacks the admission of civil findings, conclusions, orders and judgments as evidence in the disciplinary proceedings against him because they were not themselves made in disciplinary proceedings. We believe, however, that the statute addresses *only* the subject of findings rendered in *other disciplinary proceedings* and does not speak to the issue of when such evidence originating in ordinary *civil proceedings* is admissible. Because the Legislature's intent seems to have been focussed on removing doubt that the State Bar Court could consider such evidence when rendered in disciplinary proceedings, but the statute is silent upon the rule in civil proceedings, we view it as inapplicable to the latter and do not apply the *expressio unius* principle. Petitioner fails to distinguish our controlling decision in *Caldwell* v. *State Bar* (1975) 13 Cal.3d 488, 496-497 [119 Cal.Rptr. 217, 531 P.2d 785], holding such nondisciplinary civil matters admissible as evidence in the disciplinary proceedings when there is "essential identity of the factual issues in both proceedings." Our independent review of the record compels our concurrence with the State Bar's position that the nontestimonial evidence from other proceedings to which petitioner was a party was properly admitted here under *Caldwell.*

B. *Ethical Breaches in Connection with the Dallas Cabana Hotel Bankruptcy Proceedings*

1. *Petitioner's Filing of a Sham Plan of Arrangement and Subsequent Debt Claim Formulated to Deprive the Melcher Plan of Majority Approval*

After his termination as Terrence's attorney, petitioner filed a bankruptcy petition in the matter of the Dallas Cabana Hotel, a corporation he had helped form and had induced the Melchers to invest in, as shall be explained in greater detail below.

The State Bar Court found that petitioner (1) failed to timely file required documents necessary to the bankruptcy proceeding, even though ordered by the court to do so, (2) filed a sham plan of arrangement, and (3) filed a sham debt claim for the purpose of denying majority approval to the Melcher plan of arrangement. These findings are fully supported by the following findings of the bankruptcy court that presided over the matter (United States District Court for the Northern District of Texas, Dallas Division).

In late November 1968, petitioner caused to be filed on behalf of Dallas Cabana, Inc. a petition in bankruptcy court. Petitioner filed the petition without a schedule of assets and liabilities, a statement of affairs or a statement of executory contracts.[12] Despite a court order that they be filed by December 5, 1968, petitioner did not file the required documents until April 1, 1969.

On February 11, 1969, the bankruptcy court ordered all plans of arrangement for the hotel to be filed by March 3. The Melchers complied with the order and proposed a plan of arrangement based on the sale of the hotel to Donald Pritzker, president of Hyatt Corporation, for $4.5 million. Attached to the plan was a duly executed contract of sale supported by a cash deposit of $100,000. The contract provided that if the court did not enter an order approving the sale by June 24, 1969, Pritzker could withdraw his offer.

Before the hearing on the Melcher plan of arrangement, 100 creditors whose claims totaled $1,872,000 accepted the Melcher plan. The plan was not accepted by 48 creditors whose claims totaled $591,302, and of that sum, $558,262 represented claims filed by Cabana Management, a firm owned and controlled by petitioner and Rosenthal & Green, petitioner's former law firm.

---

[12] In November 1968, Terrence Melcher filed a second petition on behalf of Dallas Cabana, Inc. The Melcher group filed its requested documentation within the time prescribed by the court.

Petitioner did not file his plan of arrangement by March 3 or by the time of the hearing on the Melcher plan. Instead, petitioner attempted to block the sale to Pritzker by inflating the claims of both Cabana Management and Rosenthal & Green to over $2,296,000, thus creating the false impression that petitioner's group possessed the majority interest. The bankruptcy court specifically found that these amended claims were grossly exaggerated and false and were filed for the purpose of blocking confirmation of the Melcher plan of arrangement.

Petitioner thereafter moved for an extension of time until May 1, 1969, to file his own plan of arrangement. Although the court was of the opinion that the Pritzker offer was a fair one and although the hotel was operating at a loss, thereby decreasing the equity potentially available to unsecured creditors, the court granted petitioner's motion on the condition he file a schedule of assets and liabilities by April 1, 1969.

On April 1, petitioner filed the requisite schedules, which the court found were, for the most part, the same schedules the Melchers had filed. Although filed by the May 1 deadline, petitioner's plan of arrangement was found by the bankruptcy court to be "a sham, filed in bad faith and. . . interposed solely for the purpose of attempting to prevent this Court from considering the adjudication of the debtor as a bankrupt on [the scheduled hearing date of] April 30, 1969. [Petitioner] Rosenthal's arrangement had attached a proposed sales contract dated April 7, 1969. The plan alleged that 'Prior to the filing of this arrangement, the debtor (for itself and other sellers therein named) has negotiated a purchase agreement with the buyer.' That allegation was false and [petitioner] knew it to be false. At the time [petitioner] filed his plan, the proposed purchasers not only had not signed the contract, but had not even orally agreed to it."

Petitioner's conduct and dilatory tactics caused the withdrawal of Pritzker's first offer and the subsequent acceptance of a lower offer resulting in a substantial monetary loss to the bankrupt estate.

2. *Petitioner's Pretrial Misrepresentations to the Bankruptcy Court*

The State Bar Court made the following findings with regard to petitioner's misrepresentations to the bankruptcy court in Dallas: (1) Petitioner first represented that the Melcher interests owned the Dallas Cabana Hotel; however, when a bona fide offer to purchase that asset was received, he falsely stated that the hotel was actually owned by a joint venture; (2) on six separate occasions in 1969, petitioner misrepresented the value of the Dallas Cabana Hotel; (3) three times in 1969, petitioner falsely asserted that a purchaser was ready, willing and able to pay, and had offered to pay, in

excess of $4.5 million for the Dallas Cabana Hotel; (4) in February 1969, petitioner supported his opposition to the issuance of an order directing the filing of plans of arrangement with the misrepresentation that he had been denied access to Dallas Cabana Hotel books and records; (5) in May 1969, petitioner opposed the issuance of an order quieting title to the Dallas Cabana Hotel and supported his opposition with the following misrepresentations: (a) his former client had illegally seized records containing information essential to his preparation for the hearing on that order; (b) the above seizure was then the subject of an appeal in California state courts and hence the bankruptcy court should not act pending resolution of that appeal; and (c) the seized records were stored 10 to 15 miles from petitioner's office; (6) petitioner supported his objections to interrogatories of the trustee in bankruptcy with the misrepresentation that a receivership established by a California court had deprived him of access to records necessary to allow him to answer such interrogatories; and (7) each of the above statements was made intentionally, with knowledge of its falsity, for the purpose of delay, and in bad faith, and resulted in obstruction of justice.

The State Bar Court's findings are fully supported by the findings of the bankruptcy court.

### 3. *Petitioner's Other Pretrial Conduct in the Bankruptcy Proceedings*

The State Bar Court found that before the trial in the Dallas bankruptcy proceedings, petitioner engaged in conduct intended to delay commencement of the trial, harass his former clients and obstruct the orderly administration of justice. The bankruptcy court concluded that "the same conduct which was characteristic of [petitioner] and those he controlled during the course of other matters in these proceedings characterized the claims litigation—delay, misrepresentation, misconduct in court and an overall attempt at frustrating the progress of the bankruptcy proceedings."

In late November 1969, within 10 days of the start of the bankruptcy trial, petitioner, his law partner Green, and Cabana Management filed a motion to disqualify William J. Rochelle, Jr., Phillip J. Palmer, Jr., and J. Ronald Trost as cocounsel to the trustee in bankruptcy. The bankruptcy court noted that its order authorizing the employment of these individuals was entered after an evidentiary hearing in May 1969, that pursuant to the trustee's application it had authorized an increase in the scope of employment of these counsel, and that petitioner had waited five months until the eve of trial before renewing his disqualification objection. Finding that "[petitioner's] obvious purpose in filing the motion on the eve of trial was to gain a continuance because if counsel were disqualified, it would have taken months for new counsel to prepare for trial," the court nevertheless "again

considered the issues raised in the disqualification motion and again found them to be totally without merit."

Moreover, the bankruptcy court further found that petitioner's dilatory tactics continued up to the day of trial. Six days before trial, petitioner filed a petition to transfer the entire bankruptcy proceedings to California. Petitioner, his partner Green and his employee Harrison each refused to sign their depositions. Finally, despite the statement of petitioner's counsel to the contrary, necessary amendments to the claims of Rosenthal & Green and Cabana Management were not made before the start of trial. The trial court in Samet v. Day made similar findings with respect to petitioner's propensity for delay and abuse of the judicial process.

### 4. Petitioner's Obstructive Conduct During the Bankruptcy Trial

The State Bar Court determined that during the Dallas bankruptcy proceeding, petitioner engaged in conduct intended to delay the trial's progress, harass the Melchers and obstruct the orderly administration of justice. Petitioner's conduct included his (1) obstinate, insulting and defiant conduct toward the court; (2) evasive testimony; and (3) specious objections to questions asked by opposing counsel. These findings are amply supported by those of the bankruptcy court, which found, inter alia, as follows: "Not only was [petitioner] an evasive witness, he was so insulting and rude, both to the court and opposing counsel, that I can only conclude that he was attempting to goad this court into error. [¶] [Petitioner] was on the stand for two days. When examined on direct, he had a precise memory for conversations dating back to 1960. When questioned on cross-examination, he was repeatedly evasive. The cold record of his testimony in print is only part of the story . . . . Observations by this Court of his obstinate and defiant conduct, the emphasis in his speech, his snide remarks, the tone of his voice, his frequent sarcasm toward this Court and opposing counsel, his convenient lack of memory and his alleged 'inability' to understand routine questions put to him, made it clear he was not telling the truth. [¶] Because of [petitioner's] hostility and gross impertinence toward the Court, I inquired of [petitioner's] counsel whether [petitioner] would be a cooperative witness, but it was soon apparent that [petitioner's] counsel could not control [him]. On several different occasions after [petitioner] took the stand under protest, [petitioner] had to be restrained by his counsel in order to prevent a total breakdown of the trial proceeding."

In a decision sustaining each of the actions of the bankruptcy referee, the Fifth Circuit Court of Appeals made the following observations with respect to petitioner's conduct: "Nor do we find error by the Referee in terminating the hearing on the claims presented by [petitioner] and his

associates. The Referee found that [petitioner] was not acting in good faith during the hearings on the validity of claims, but was intentionally delaying this part of the action. His techniques for obstructing the progress of these proceedings included failure to appear at hearings, frequent and unmeritorious excuses for walking out of depositions, refusals to answer interrogatories, repeated dilatory pre-trial motions and requests for continuances, and obstinate conduct while on the witness stand." (*Dallas Cabana, Inc.* v. *Collier* (5th Cir. 1972) 469 F.2d 606, 609-610.)

### 5. *Petitioner's False Testimony Under Oath*

The State Bar Court found that during the Dallas bankruptcy trial, petitioner testified that his law firm had not received payment for legal services rendered to the Dallas Cabana Hotel, and that this testimony was knowingly false, as his firm had received $20,000 for such services. The bankruptcy court specifically found that "[petitioner] testified on at least three different occasions that his firm had never been paid any amount whatsoever for legal services due from the Dallas Cabana. In truth and in fact, [petitioner's] own files contained a letter from his secretary acknowledging the receipt of $20,000 from the Dallas Cabana Hotel 'for legal services to date.' "

### C. *Petitioner's Representation of Conflicting Interests*

In January 1963, petitioner created and incorporated Cabana Management, Inc. He became an officer and director as well as the corporation's controlling stockholder. Cabana Management, Inc. was used by petitioner as his alter ego to manage and control the operations of both the Palo Alto and Dallas Cabana Hotels.

The State Bar Court found that petitioner's creation of Cabana Management, Inc. to manage the interests of the Palo Alto and Dallas Cabana Hotels resulted in (1) Cabana Management, Inc.'s interest being adverse to petitioner's own clients; (2) petitioner's representation of conflicting interests without having obtained the consent of all parties involved; and (3) Cabana Management, Inc.'s establishment as a fraudulent device for the purpose of obtaining funds through sham, exaggerated and duplicative claims made by petitioner's law firm for services previously rendered. These findings are fully supported by the record.

Petitioner's participation in the hotel operations began in 1959 and continued until his termination as the Melchers' attorney in 1968. In 1959, petitioner represented Clifford Heinz of Heinz Enterprises (Heinz), who was interested in constructing a luxury hotel to be known as the Palo Alto

Cabana Hotel. Through Heinz, petitioner met Jay Sarno, a hotel promoter and developer, who became involved with the Palo Alto Cabana Hotel and later with the Dallas Cabana Hotel. Petitioner acted as attorney for both Heinz and Sarno in the hotel matters and assumed additional duties, including the arranging of financing for the hotels.

In 1960, petitioner advised the Melchers (Doris Day Melcher, Martin Melcher and Arwin Productions, Inc.) to advance funds for the Palo Alto hotel in return for an undefined equitable interest in the hotel. In 1961, when Sarno was promoting the Dallas Cabana Hotel, petitioner once again advised the Melchers to advance funds for the construction of the hotel.

In connection with these investments, petitioner acted as attorney for all the parties. While so doing, petitioner failed to inform the Melchers of the actual and potential conflicts of interest between the Melchers and his other clients, including the fact that Heinz and Sarno did not contribute any of the initial capital, as was expected by the Melchers, and did not pay any of the initial expenses of the hotels, even though they received interests substantially equivalent to the Melchers'. Petitioner also failed to disclose to the Melchers that he obtained an interest in the hotels without contributing either capital or services, other than services for which he was already compensated by the Melchers.

Between 1962 and 1968, additional capital was required to pay the hotels' obligations. Although petitioner advised the Melchers to continue advancing cash, he failed to advise them that the hotels were insolvent and severely under-capitalized. Petitioner also neglected to advise the Melchers that, because of these problems, the obligations owed them for their additional investments would not be met. Instead, petitioner induced the Melchers to use personal funds to pay obligations, without limitations, including the hotels' mortgages, promissory notes for the purchase of furniture and the services of the general contractor and other notes and guaranteed obligations. Petitioner further advised the Melchers to pay Heinz and Sarno's respective shares of their joint and several obligations while failing to take appropriate steps to protect the Melchers' right to contribution.[13]

Between 1961 and 1968, petitioner advised the Melchers that the hotels would be profitable and that each hotel had a fair market value substantially

---

[13] Petitioner represented to the Melchers that their investment in the hotels would be one of limited liability in that it was oral and that Heinz Enterprises, Sarno and the Melchers would each be liable for only one-third of the hotels' obligations. Petitioner negligently failed to reduce this oral contract to writing so as to preserve the Melchers' rights of contribution without expensive litigation. Thus, the Melchers, while in fact personally liable for most of the hotels' obligations, received no clearly definable interests in the hotels' assets and had no readily enforceable recourse against coparticipants.

in excess of its true fair market value. Petitioner, who had an interest in each hotel for himself and his law firm, failed to take any action necessary to allow the Melchers to make independent, informed decisions with respect to payments made for the hotels' continued operation. Petitioner failed to render independent legal advice or advise the Melchers to seek independent counsel. He also failed to disclose adequate or accurate financial and other material information about the hotels. By the time the Melcher parties had obtained independent legal counsel in mid-1968 following Martin Melcher's death, the Palo Alto Cabana Hotel was insolvent. The Dallas Cabana Hotel was adjudicated bankrupt in May 1969.

D. *Petitioner's Purchase of Federal Land Bank Bonds for Himself While Purchasing the Same Investment for his Clients*

The State Bar Court found that around March 1953, petitioner negotiated the purchase of $3 million worth of Federal Land Bank bonds for Martin and Doris Day Melcher. The bonds were purchased from petitioner's client, Bernard Cantor, of the Cantor-Fitzgerald Company. Under the purchase plan, which was supposed to produce losses that would generate tax savings for the Melchers, they acquired the bonds on credit and executed a promissory note bearing a 4.25 percent interest rate. While representing the Melchers' interests in this transaction, petitioner, without their knowledge or consent, negotiated for himself the purchase of $1 million worth of the same bonds on credit at an interest rate of only 3.5 percent. Petitioner's failure to arrange the same rate for the Melchers resulted in their paying over 400 percent more in out-of-pocket expenses than petitioner paid in this regard. This finding has abundant support in the record of Samet v. Day and was also detailed in the Court of Appeal decision affirming that judgment, which we may judicially notice. (See *Day* v. *Rosenthal, supra,* 170 Cal.App.3d at pp. 1137-1138.)

E. *Petitioner's Conduct During His Deposition in the Matter of Doanbuy Lease and Company v. Melcher et al.*

In 1969 petitioner, acting as president of Doanbuy Lease and Company, Inc. (hereafter Doanbuy), filed four separate actions in the District Court of Lea County, New Mexico, against the Melchers and other named defendants. Each of these lawsuits alleged that defendants were indebted to Doanbuy for proportionate shares of expenses incurred by the company in operating gas and oil wells in New Mexico.

In April 1970, the Melcher interests successfully moved the New Mexico court to compel the deposition of petitioner in California. When petitioner appeared at his April 28 deposition, his conduct was evasive and hostile,

and he repeatedly interposed bad faith objections. The deposition was terminated when, at the close of the day, petitioner indicated he would not return for the next day.

Thereafter, the Melcher parties filed a motion to dismiss the New Mexico action on the ground that petitioner, an officer and managing agent of Doanbuy, wilfully failed to appear for his deposition after having been duly served with notice. The trial court ordered, inter alia, that petitioner be given an opportunity to remedy the matter, that the deposition should be promptly taken in New Mexico and that the Melcher parties' motion would thereafter be heard.

The Melcher parties immediately noticed the deposition of petitioner for late June in New Mexico. Doanbuy moved for a protective order quashing the notice of taking the deposition or, in the alternative, limiting its scope. At a hearing on the matter, the court ruled that petitioner must submit to a New Mexico deposition, but that the time therefor was limited to two 8-hour sessions. On July 9 and 10, petitioner appeared for scheduled deposition. He engaged in conduct similar to that manifested during the earlier Los Angeles deposition. The Melchers successfully renewed their motion to dismiss on the ground that petitioner refused to appear and give his deposition, and the trial court's order of dismissal was affirmed by the Supreme Court of New Mexico. That high court, in a published opinion, summarized petitioner's conduct: "Mr. Rosenthal's conduct at the deposition is somewhat difficult to describe. . . . [T]he . . . [New Mexico July 9 & 10] deposition seems worse than the one taken in Los Angeles. The statements of Mr. Rosenthal consisted of evasions, expressions of hostility, insults, admonitions, objections, demands that counsel explain what bearing questions had upon the issues as prerequisites to answering, arguments and other similar responses. Pages are consumed by statements of inability to remember, which strain credulity to the breaking point, and with refusals to answer questions because of a claim that a question is pending that the witness cannot understand and will not permit to be withdrawn. These are merely examples." (*Doanbuy Lease and Co.* v. *Melcher* (1971) 83 N.M. 82 [488 P.2d 339, 341].)

F. *Petitioner's Filing of Numerous Lawsuits Against the Melcher Parties*

The State Bar Court found petitioner filed numerous lawsuits for the purpose of harassing his former clients.

In the Samet v. Day decision, the trial court found petitioner "misused the confidential information previously imparted to him by his clients for

his own gain, in filing unfounded claims, vexatious lawsuits and other legal proceedings in California, New Mexico, Oklahoma and Texas. He skillfully and with malice abused the process of courts to harass his former clients."

The trial court additionally found that "[a]ll of the legal proceedings instituted by [petitioner] against the Melcher parties were initiated and prosecuted for corrupt motives including spite, harassment and delay. [Petitioner] knew or should have known that the allegations contained in pleadings which he verified were false." The court accordingly imposed attorney fees of $850,000 against the Rosenthal defendants based on the multiplicity of civil proceedings initiated by petitioner Rosenthal and the lengthy and complex preparations required of the Melchers' attorneys in the defense of 11 consolidated cases instituted by petitioner.

The trial court concluded that petitioner's initiation of 18 separate legal proceedings in 5 separate state and federal courts was oppressive and malicious and was motivated by his recognition that the multiplicity and conduct of all the litigation would cause the Melcher parties to incur additional expenses and could force them to accept an inequitable settlement of his false claims.

G. *Petitioner's Failure, as Attorney for the Melcher Estate, to Disclose His Interest in Payments Made on the Estate's Behalf*

After Martin Melcher's death in April 1968, petitioner caused Terrence Paul Melcher to be appointed administrator of his late father's estate. Petitioner thereafter advised Terrence to authorize certain payments on behalf of the estate, including, but not limited to, a payment of $60,000 to Republic Supply Company and a payment of $17,000 to Arkansas-Louisiana Production Co.[14] Petitioner failed to disclose, inter alia, that these payments were made to finance business ventures supported by petitioner and that, at the time petitioner advised Terrence to make the payment to Arkansas-Louisiana Production Co., a lawsuit was pending against petitioner by that company.

The trial court further found that Terrence, at the time of these transactions, was 26 years old and had no prior contact or familiarity with the investment or business affairs of his parents. Instead, he relied exclusively on petitioner to act in the best interests of the Melcher family. The trial

---

[14] The State Bar Court also found that petitioner caused Terrence to execute a $136,000 promissory note to Arwin Productions, Inc., and the State Bar so contends in its brief. The State Bar's citations, however, disclose no basis for this finding, nor does our independent review of the record before us. We find this minor discrepancy an anomaly that does not affect our disposition of the issues before us.

court concluded that petitioner did not render or invite Terrence to obtain independent legal advice regarding the payments and that the failure to do so constituted negligence and a breach of the fiduciary and contractual duties owed to Arwin Productions, Inc., Terrence and the estate.

## III.

Petitioner's brief in this court presents a largely technical defense devoid of any sincere discussion of the merits of the serious findings against him. He asks that we strike or disregard the State Bar's brief and dismiss the proceedings entirely, or, in the alternative, either dismiss the proceedings with admonition (Rules Proc. of State Bar, rule 415), or remand the matter to the State Bar Court with appropriate instructions so that he may obtain a fair hearing before a new Hearing Panel.

In support of these requests, petitioner submits a lengthy and disjointed list of arguments, which can best be summarized as follows: (1) the admission of the Samet v. Day trial transcripts denied petitioner a fair trial because: (a) petitioner's Sixth Amendment confrontation rights were thereby violated, (b) Evidence Code section 1291, subdivision (a)(2)'s narrow exception to the hearsay rule was thereby contravened, (c) section 6049.1 prohibits admission of such transcripts, (d) petitioner had no opportunity to read the transcripts before they were admitted, contrary to the Hearing Panel's promise that he would be allowed to do so, (e) admission of the transcripts improperly lowered the standard of proof in State Bar proceedings from "clear and convincing" to a "preponderance" standard, (f) the Hearing Panel exceeded its jurisdiction by admitting the transcripts sua sponte, and (g) the evidence is irrelevant and prejudicial; (2) the State Bar Court violated petitioner's right to procedural due process by finding he had committed acts uncharged in the notice to show cause; (3) the Hearing Panel improperly restricted petitioner's defense by submitting the matter for decision when his brief was three months late; (4) the Hearing Panel was biased and prejudiced against petitioner; (5) the Hearing Panel improperly admitted the findings, judgments and conclusions of other courts; (6) the Hearing Panel improperly refused to allow petitioner to see or to ask detailed questions about a document ruled, in accordance with the State Bar trial examiner's request, a nondiscoverable work product; (7) the Review Department denied petitioner a hearing and failed to independently review the record; (8) the State Bar has waived the right to deny the truth of any of petitioner's factual and legal contentions which it did not specifically reply to in its brief before us, thus establishing a complete defense for petitioner; (9) the lengthy proceedings should be dismissed on the ground of delay prejudicial to petitioner; and (10) petitioner's lack of prior discipline is a significant mitigating circumstance.

Because we find petitioner's arguments completely meritless, we conclude that he has failed to carry his burden of showing that the Review Department's recommended discipline of disbarment should not be followed. (*Emslie* v. *State Bar* (1974) 11 Cal.3d 210, 219-220 [113 Cal.Rptr. 175, 520 P.2d 991].) We will address his arguments briefly.

■ As noted above, when the State Bar evidentiary proceedings commenced in 1976, the State Bar elected to present its case against petitioner through certain written materials that were previously the subject of civil, probate, bankruptcy and tax proceedings between petitioner and the complainants. As we have noted (see *ante,* fn. 6), in disciplinary proceedings against attorneys, "the testimony of a witness given in a contested civil action or special proceeding to which the person complained against is a party, or in whose behalf the action or proceeding is prosecuted or defended, may be received in evidence, so far as relevant and material to the issues in the disciplinary proceedings, by means of a duly authenticated transcript of such testimony and without proof of the nonavailability of the witness . . . ." (§ 6049.2.)

Petitioner was either a party plaintiff or defendant in each underlying civil proceeding whose transcripts were introduced into evidence, or, as in the case of the suits involving his law firm and the corporations he controlled, a person upon whose behalf the litigation was prosecuted or defended. In each proceeding, petitioner enjoyed a full opportunity, and had a strong motivation effectively to cross-examine adverse witnesses. While petitioner may well have been unaware that unethical conduct disclosed and manifested during the various civil proceedings he initiated or defended would actually be charged against him by the State Bar, he had, at that time, ample interest and motive in refuting any false accusations or statements in this regard. Insofar as his conduct of the proceedings themselves is now challenged as an abuse of process, he cannot seriously claim a lesser motive in proving his assertions in those proceedings on behalf of himself, his corporations, and his clients, than he has in proving the same assertions now on behalf of his license to practice law. Hence, under section 6049.2, all relevant testimonial transcripts from the underlying civil proceedings were properly admitted in evidence in the instant disciplinary proceedings. (*Eschwig* v. *State Bar* (1969) 1 Cal.3d 8, 18 [81 Cal.Rptr. 352, 459 P.2d 904, 35 A.L.R.3d 662].) We find also that, as to those actions in which petitioner was a nominal party, Evidence Code section 1291, subdivision (a)(2), compels the same conclusion.

Furthermore, petitioner provides no record citations in support of his broad claims of undue prejudice from the admission of the records of the underlying civil litigation. Although the usual rules of evidence for civil

cases in courts of record are generally followed in formal State Bar Court proceedings, "no error in admitting or excluding evidence shall invalidate a finding of fact, decision or determination, unless the error or errors complained of resulted in a denial of a fair hearing." (Rules Proc. of State Bar, rule 556.)

■ Additionally, the pleadings, findings, conclusions, and judgments in the underlying actions were both properly admitted in evidence before the Hearing Panel (see *ante,* fn. 11), and are subject to judicial notice by this court as well, where, as here, the factual issues in the underlying proceedings and the disciplinary proceedings are essentially identical. (*Caldwell* v. *State Bar, supra,* 13 Cal.3d at pp. 496-497.)

Petitioner's citations to criminal cases and attempted invocation of a "quasi-criminal" talisman do not support his confrontation-clause claims. ■ Petitioner's only due process entitlement is a "fair hearing," and the rules of criminal procedure do not apply in State Bar disciplinary proceedings. (*Smith* v. *State Bar* (1985) 38 Cal.3d 525, 532 [213 Cal.Rptr. 236, 698 P.2d 139]; cf. *Eschwig* v. *State Bar, supra,* 1 Cal.3d at p. 18.)

■ Petitioner's contention that admission of the civil court findings, conclusions and judgments impermissibly lowered the standard of proof in State Bar proceedings from "clear and convincing" evidence to the lower "preponderance" standard of civil cases is also meritless. ■ It is, of course, well settled that we must independently examine the evidence and pass upon its sufficiency in State Bar matters. (*Alberton* v. *State Bar* (1984) 37 Cal.3d 1, 11 [206 Cal.Rptr. 373, 686 P.2d 1177, A.L.R.4th 1487].) ■ Petitioner, however, bears the burden of demonstrating "that the charges of unprofessional conduct are not sustained by convincing proof and to a reasonable certainty." (*Himmel* v. *State Bar* (1971) 4 Cal.3d 786, 794 [94 Cal.Rptr. 825, 484 P.2d 993].) ■ The civil findings, conclusions and judgments at issue here were not judicially noticed for their truth or given preclusive effect by the State Bar Court and, under *Caldwell* v. *State Bar, supra,* 13 Cal.3d at pages 496-497, they were properly admitted into evidence because they addressed issues substantially identical to those before that court in the disciplinary proceeding. These civil court pronouncements provided a sufficient basis for the State Bar Court's findings; our independent review of the record reveals that petitioner has not carried his burden of showing these findings to be unsupported by the evidence. (*Trousil* v. *State Bar* (1985) 38 Cal.3d 337, 341 [211 Cal.Rptr. 525, 695 P.2d 1066].) Moreover, petitioner has not attacked the truth of the State Bar Court's findings and conclusions except to say that he is guilty of "no wrongdoing whatsoever."

Petitioner alleges that he was denied a fair hearing because of numerous other actions taken by the State Bar Court. He claims the Samet v. Day transcripts were unfairly admitted sua sponte in excess of the Hearing Panel's jurisdiction and in breach of the Hearing Panel's promise that he would have an opportunity to review and read them before the committee did so. Petitioner's record citations disclose no such promise and, even if they did, no prejudice would be shown. The record discloses that petitioner was given more than enough time to review any and all documents before they were introduced into evidence. A great many of the years spent compiling the 81 volumes of transcripts amassed during the proceedings before the Hearing Panel were devoted to petitioner's claims on the admissibility of the underlying civil transcripts. The State Bar announced from the outset of the evidentiary proceedings and repeated frequently in oral motions that its intention was to introduce all of the Samet v. Day transcripts. After much argument, the transcripts were all admitted for the *limited purpose* of determining whether the underlying proceeding occurred under circumstances which provided petitioner an opportunity for adequate cross-examination. It was correctly determined that these circumstances existed. Petitioner had more than adequate time and ample warning to review transcripts with which he was already presumably familiar. No unfairness or jurisdictional impropriety appears.

Several of petitioner's claims, although patently meritless, would not have demonstrated an unfair hearing even if accepted. The uncharged offenses that the Hearing Panel found supported by the evidence were included not in its findings of fact or conclusions of law, but in a section of its decision entitled "Matters in Mitigation or Aggravation." We have not relied on these uncharged offenses in making our disciplinary decision and we find that they could not conceivably have changed the State Bar Court's recommendation even if refuted, especially since no matters in mitigation were found. The "illegally constituted" body of two Hearing Panel members petitioner claims was created when panel member Palmer resigned after approximately seven years of service did not prejudice petitioner; the record, to the contrary, reveals that Palmer disagreed with petitioner's contentions more often during his tenure than the remaining two members.

We have held "that participation by two members of a three-member panel constitutes a valid hearing for purposes of disciplinary action against a member of the State Bar." (*Baranowski* v. *State Bar* (1979) 24 Cal.3d 153, 165 [154 Cal.Rptr. 752, 593 P.2d 613]; *Petersen* v. *State Bar* (1943) 21 Cal.2d 866, 870-871 [136 P.2d 561].) As petitioner fails to convincingly distinguish these cases, and no prejudice has been shown, we find no error.

The argument that petitioner's defense was unfairly and abruptly truncated when his brief was three months late is frivolous—it was and is obvious that the reason for petitioner's continual delay was his *lack* of a meritorious defense. Likewise, petitioner's claims of Hearing Panel bias and prejudicial delay are not only unsupported by the record, but are contradicted by it. Under the circumstances, the panel members showed great restraint and gave petitioner wide latitude to conduct his defense as he saw fit. His claim that a "secret" sealed document was viewed by the Hearing Panel alleges no prejudice and our independent review of the record, including this document, a State Bar interoffice communication, discloses none.

Petitioner's claim that the Review Department denied him his right to a "hearing"—as distinguished from oral argument—is frivolous in light of the extensive hearing his claims received below and the generous time concessions made to him during his Review Department argument.[15] Petitioner's argument that the Hearing Panel acted unlawfully with regard to the subpoena duces tecum issued to the Clerk of the Los Angeles County Superior Court, in order to procure certain documents in connection with the Samet v. Day transcripts, is unsupported by citation to legal authority or explanation as to how petitioner was thereby prejudiced. Petitioner's remaining arguments—as to the State Bar's waiver and prejudicial delay—also completely lack merit.

■ Petitioner shows no remorse and adamantly maintains that he is completely free of any wrongdoing and that he is a mere victim "caught in the system." He also cites his lack of prior discipline as a mitigating factor warranting lesser discipline.

We agree with the State Bar Court's recommendation of disbarment and find it amply warranted by the egregious nature of petitioner's conduct and the need to protect the public from further injury.

Accordingly, we hereby adopt the State Bar Court's recommended discipline: It is ordered that petitioner be disbarred from the practice of law, that his name be stricken from the roll of attorneys, and that he comply with the provisions of rule 955 of the California Rules of Court, and that he perform the acts specified in subdivisions (a) and (c) within 30 and 40 days, respec-

---

[15] The record reveals that petitioner's request for extra time to present his arguments in the Review Department was granted. He received an additional five minutes—twice the normal allotment for oral argument.

tively, after the effective date of this order. This order is effective 30 days after the filing of this opinion.

Pursuant to the Supreme Court's order of February 18, 1988, petitioner was ordered disbarred as of September 11, 1987. Petitioner's application for a rehearing was denied September 2, 1987.